2012 OK CIV APP 32

**In the Matter of the STATE of Oklahoma IN the INTEREST of K.P. and K.P., deprived children.**

**Karinne Sanders, Appellant,**

v.

**The State of Oklahoma, Appellee.**

**No. 108,914.**

Court of Civil Appeals of Oklahoma, Division No. 2.

Feb. 17, 2012.

---

Terry D. Allen, Jr., Terry D. Allen, Jr., Attorney at Law, PLLC, Pryor, Oklahoma, for Appellant.

Janice Steidley, District Attorney, Charles A. Ramsey, Assistant District Attorney, Pryor, Oklahoma, for Appellee.

Lisa M. Bohannan, The Bohannan Law Office, P.C., Pryor, Oklahoma, for Minor Children.

Nason N. Morton, Senior Assistant Attorney General, Tahlequah, Oklahoma, for Cherokee Nation.

JOHN F. FISCHER, Chief Judge.

¶1 Karinne Sanders (Mother) appeals from the district court's judgment entered on jury verdict terminating her parental rights to her minor children KP and KP. Both

children are members of the Cherokee Nation. The Cherokee Nation had notice of and participated in the proceedings as required by the state and federal Indian Child Welfare Acts.

## BACKGROUND

¶ 2 Mother tested positive for opiates at the time of her younger child's birth at Hastings Indian Medical Center on October 3, 2008. The Cherokee Nation investigated and offered Mother such services as parenting education and counseling for substance abuse and domestic violence, to be provided at her home. Although Mother agreed to participate in the program, she would not meet with the parenting educator who came to her home. After several unsuccessful attempts to meet with Mother, the Cherokee Nation determined that Mother was noncompliant and referred the matter to the Oklahoma Department of Human Services (DHS).

¶ 3 DHS at first sought Mother's voluntary compliance with a plan to treat and improve conditions in her home. On December 1, 2008, the State filed a petition seeking adjudication of KP and KP as deprived. The State alleged that the children did not have proper parental care; Mother took nine different prescription medications prescribed by six different doctors and was under the influence of those drugs while caring for children. The State further alleged that on November 24, 2008, a DHS caseworker visited the home and Mother did not answer the door. She heard the older child hitting the door and crying. When Mother finally answered the door, she appeared confused. Mother told the caseworker she had been sleeping, but subsequently failed a field sobriety test. The two children were taken into emergency custody by DHS. At that time, the older child was thirteen months old and the younger child was less than eight weeks old. DHS placed the children with foster parents in a home approved by the Cherokee Nation.

¶ 4 Following a hearing, the district court entered its February 4, 2009 order adjudicating the children deprived. Initially, the goal

was to reunite the children with Mother in a home that was safe and free from substance abuse. To accomplish this, the district court entered an individualized service plan (ISP) for Mother on April 28, 2009. The terms of the ISP required Mother, among other things, to visit the children weekly, take parenting classes at an approved agency, provide financial support for the children by way of employment or other legal means ($277 per month, later reduced to $100), complete a budgeting class and provide a budget, provide a safe home, complete a psychological evaluation by a licensed psychologist, and complete a substance abuse assessment and follow the recommendations of the assessor.

¶ 5 Alleging Mother's failure to correct conditions that led to the adjudication of KP and KP as deprived, the State, with the support of the Cherokee Nation, filed a petition seeking termination of Mother's parental rights to KP and KP. The State further alleged that Mother failed to pay support as ordered by the district court. The matter was tried before a jury in August 2010.[1] The jury determined that Mother had failed to correct the conditions that led to the adjudication of the children as deprived and failed, for at least six out of the last twelve months, to pay the court-ordered support for children or support them according to her financial ability. The district court entered judgment in accordance with the jury verdict on August 18, 2010. Mother appeals the judgment of the district court terminating her parental rights to KP and KP.

## STANDARD OF REVIEW

■ ¶ 6 Where Indian children are involved, the proceedings must comply with the provisions of both the federal Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901–1963, and its Oklahoma counterpart, the Oklahoma ICWA, 10 O.S.2011 §§ 40 through 40.9: "The Oklahoma Indian Child Welfare Act, in accordance with the federal Indian Child Welfare Act, applies to all child custody proceedings involving any Indian

1. Both children had the same father, who previously had resided in the home with Mother and the children. Father's parental rights to both children had been terminated by the time of Mother's trial.

child...." 10 O.S.2011 §§ 40.3A. Mother challenges the sufficiency of the evidence offered to prove three critical elements in the State's effort to terminate her parental rights: (1) the State's active efforts to provide remedial services and rehabilitative programs to Mother that were designed to prevent the breakup of the family; (2) Mother's failure to correct the conditions that led to the adjudication of the children as deprived; and (3) that termination was in the children's best interests. Mother argues these elements must be proved using the beyond-a-reasonable-doubt standard specified in section 1912 of the ICWA:

> (f) ... No termination of parental rights may be ordered in such proceeding in the absence of a determination, supported by evidence, beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(f). The Oklahoma Supreme Court addressed this issue in *In re Adoption of G.D.J.*, 2011 OK 77, n. 25, 261 P.3d 1159, 1169 n. 25, agreeing with this Court's finding in *In re J.S.*, 2008 OK CIV APP 15, ¶ 4, 177 P.3d 590, 591, that the beyond-a-reasonable-doubt burden of proof "only applies to the factual determination required by 25 U.S.C. § 1912(f) to be made in ICWA termination cases and the state law mandated burden of proof of 'clear and con-

vincing evidence' applies to all other state law requirements for termination." This Court in *J.S.*, although reversing the district court's interpretation of the "active efforts" requirement in section 1912(d) of the ICWA, rejected the argument that the higher burden of proof was required to show "active efforts." The "factual determination" required by section 1912(f) is whether "the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Because this is not an issue raised by Mother in this appeal, we find that the applicable burden of proof for review of Mother's evidentiary issues is the clear-and-convincing evidence burden.[2] "Clear and convincing evidence" is defined as "that measure or degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegation sought to be established." *In re C.G.*, 1981 OK 131, n. 12, 637 P.2d 66, 71 n. 12.[3]

¶ 7 As discussed in detail in Part IV of this Opinion, we review the district court's findings on alleged juror misconduct for abuse of discretion. *See Parrish v. Lilly*, 1993 OK 80, 883 P.2d 158

## ANALYSIS

### I. Failure to Correct Conditions

¶ 8 Following the February 2009 deprived adjudication, Mother was required to undergo random testing for drugs. She had

---

2. Mother's argument is consistent with the position of the dissent in *In Re E.P.F.L.* 2011 OK CIV APP 112, 265 P.3d 764, which was issued prior to the Supreme Court's opinion in *G.D.J.*

3. In its instructions to the jury, the trial court placed the heightened "beyond a reasonable doubt" burden of proof on the State on the issue of "serious emotional or physical damage" and on the state law elements. But this error is harmless because it benefitted Mother. *See In re J.S.*, 2008 OK CIV APP 15, ¶ 6, 177 P.3d at 592 (citing *Newton v. Paul*, 1950 OK 279, 203 Okla. 556, 224 P.2d 265). Revised introductory notes for the Oklahoma Uniform Jury Instructions for Juvenile Cases (OUJI–JUV) contain a committee comment section discussing the "Dual Standard of Proof for Termination of Parental Rights." Citing *In re Adoption of R.L.A.*, 2006 OK CIV APP 138, ¶ 15, 147 P.3d 306, 310, and cases from other jurisdictions, the committee states "that

there are two standards for the burden of proof for termination of parental rights." The instructions define the clear and convincing evidence standard, and then state that "the reasonable doubt standard of proof is a higher standard of proof." OUJI–JUV No. 5.3 "incorporates the applicable Oklahoma grounds for termination of parental rights and then sets forth the additional requirement of proof beyond a reasonable doubt, including the testimony of at least one expert witness, that continued custody of the child by the parent or legal custodian is likely to result in serious emotional or physical damage to the child." The Oklahoma Supreme Court has stated that it "accepts and authorizes the updated committee comments and user notes to be published with the amendments [to the instructions]." *In re Amendments to Oklahoma Uniform Jury Instructions for Juvenile Cases*, 2011 OK 23 (Order entered March 24, 2011).

positive drug tests in April 2009 for methamphetamine and marijuana, and in September 2009 for marijuana. There was evidence that DHS had requested several additional drug tests, but Mother did not go and complete the testing process when requested to do so.

¶ 9 After the State filed its petition to terminate in February 2010, there were additional episodes when Mother displayed poor judgment related to use of drugs. In July 2010, Mother tested positive for benzodiazepines and oxycodone. Mother claimed to have prescriptions for certain controlled substances, but did not provide the prescriptions to DHS or provide the medical releases it requested to document the prescriptions and confirm that she was actually taking those drugs as directed, for the medical conditions for which they were prescribed. At trial, Mother testified that she no longer used marijuana and methamphetamines. But a drug test administered during trial showed she was taking benzodiazepines and oxycodone. Mother continued to claim that she had prescriptions for the drugs she was taking, which included Lortab, Prozac and Xanax. She did not, however, present the prescriptions to the court.

¶ 10 Mother changed residences more than a dozen times while the children were in DHS custody. She stayed with various friends or family members or in trailers owned by them. She claimed that she moved frequently out of fear for her own safety and the safety of her children. In the summer of 2009, threats were made against Mother and the children. According to Mother, the threats were connected to the involvement of her father, brother and another individual in illegal drug sales and information she provided to authorities about that individual. Nonetheless, one of Mother's residences was a trailer where her brother had stayed and to which he continued to have access. Mother also claimed that she moved frequently because she wanted to avoid conflict with Father, and yet she was still married to him at the time of trial.

¶ 11 Mother did not have a valid driver's license; it had been suspended since the time the children were taken into DHS custody. Mother claimed she was working on reinstating her license by "paying on her fines." However, she continued to drive. She failed to appear for scheduled appointments and court review dates, claiming lack of transportation, but her testimony revealed that she had access to more than one vehicle during the period her children were in DHS custody. She was able to provide her own transportation to visits with the children and maintained a regular visitation schedule, except for the times her visitation was suspended due to a positive drug test or failure to appear at a disposition hearing.

¶ 12 In May 2010, Mother was arrested with her brother on charges of first degree burglary. She drove her brother to the home he was accused of burglarizing. While at the home, her brother beat up a man. Mother attributed the incident to excess drinking by her brother, and she did not think that the burglary charge should have been filed against her because she "didn't do anything." She insisted that she was going to have the criminal case "taken care of."

¶ 13 Mother did not complete a budgeting class. Her employment was sporadic and she did not make any of the court-ordered child support payments. At the time of trial, Mother did not have a job. She had been living for about two weeks in a trailer owned by her aunt. According to Mother, she could stay there rent free: "And she's letting me keep it until I can get a job and everything."

¶ 14 Mother completed some of the ISP requirements during the 18–month period between the deprived adjudication and August 2010 trial. She underwent a psychological evaluation on October 29, 2009. Dr. Grundy, who performed the evaluation, determined that Mother had a clear understanding of her ISP. Dr. Grundy diagnosed Mother with "polysubstance dependence," which was furthering her depression and anxiety. He advised Mother to have a medical evaluation to determine the specific prescriptions she needed to control her depression and any medical conditions she might have, because he was concerned that Mother was abusing prescription drugs by taking more than what was prescribed for her or "recreationally enjoying the effects" as opposed to using the drugs just to control a

medical condition or a mental health condition. Mother, however, did not obtain the medical evaluation Dr. Grundy recommended.

¶ 15 Mother eventually completed the required parenting skills classes, but not until mid-April 2010, a year after her ISP was instituted. She obtained the required substance abuse assessment in May 2010, but did not follow through on the recommendations that resulted from that assessment, which included completion of a 90–day outpatient treatment program and domestic violence counseling.[4]

¶ 16 There is clear and convincing evidence in the record showing that Mother failed to correct the conditions that led to the adjudication of her children as deprived. Not only did Mother fail to undergo the medical evaluation required to control and monitor her use of various prescription medications, but also she failed to obtain the recommended outpatient treatment to address her substance abuse and the domestic violence counseling that would benefit her life and her children.

## II. Active Efforts

■ ¶ 17 The State has the burden of proving the section 1912(d) "active efforts" requirement. *See In re J.S.*, 2008 OK CIV APP 15, ¶ 5, 177 P.3d 590, 591–92. We find persuasive and agree with this Court's definition in *J.S.*, the "active efforts" standard requires more effort than the "reasonable effort" standard in non-ICWA cases. *Id.*, ¶ 15, 177 P.3d at 593–94.[5]

¶ 18 Further, the district court properly made the required predicate finding of "active efforts" before allowing Mother's case to proceed to the jury, overruling Mother's demurrer to the State's evidence: "The Court finds from the evidence that [DHS] and the Cherokee Nation have provided sufficient active efforts to assist [Mother] to correct the conditions that led to her children being ad-

judicated deprived and prevent the breakup of the Indian family."

¶ 19 Alayna Farris, the child welfare specialist for the Cherokee Nation, and David Goff, the DHS caseworker assigned to Mother's case, both testified regarding the variety of active efforts undertaken to assist Mother and prevent the breakup of the family. Both the nature of the required services and timing of those services are well documented in the record. The record does not support Mother's assertions that she had no assistance; rather, the record shows that Mother was provided active assistance with the resources available from DHS and the Cherokee Nation.

¶ 20 Mother attempted to justify her failure to obtain and/or complete the required services of her ISP by claiming that Goff hated her, would not assist her, and even interfered with her attempts to meet the requirements of the ISP. She claimed that Farris was helpful to her at first, but not after their relationship failed.

¶ 21 The record does not show either that Farris was indifferent to Mother's circumstances or that DHS interference prevented her from completing her ISP in a timely manner. Farris testified that Goff acted appropriately and did "everything he could" to help Mother, "considering the fact that [Mother] was not always willing to accept his help."

¶ 22 Mother is correct in her statement that failure to comply with the service plan, in itself, is not a ground for termination. We agree that "[t]he test ... is not whether [Mother] completed the plan but whether [she] corrected the conditions which led to the adjudication." *In re A.G. and E.G.*, 2000 OK CIV APP 12, ¶ 6, 996 P.2d 494, 497. But Mother's substance abuse was the reason the Cherokee Nation and DHS became involved with her children and the underlying reason for the deprived adjudication. "The State

---

4. Mother testified that Father had been abusive in their relationship and she was trying to take the steps to break away from him, including getting some help to obtain a divorce from him.

5. "There is no precise definition for what constitutes 'active efforts,' and it should be determined

by the court on a case by case basis." Oklahoma Uniform Jury Instructions for Juvenile Cases, (Oklahoma Supreme Court Committee's Introductory Note, ch. 5) (citing *In re J.S.*, 2008 OK CIV APP 15, ¶ 7, 177 P.3d at 592).

uses noncompliance with the plan as evidence that parental rights should be terminated because the bad conditions caused by or in control of the [parent] have not been corrected within the statutory time." *In re J.M.,* 1993 OK CIV APP 121, ¶ 4, 858 P.2d 118, 120. The State proved by clear and convincing evidence that Mother, despite making some progress on her ISP, failed to correct the conditions that led to adjudication of her children as deprived.

### III. Testimony from Qualified Expert

¶ 23 Alayna Farris testified as Indian Child Welfare Specialist for the Cherokee Nation. She testified that she is a citizen of the United Keetoowah Band, familiar with the customs and traditions of the Cherokees and that she has worked extensively with Indian children. She was recognized by the Cherokee Nation as an expert in tribal customs and practices and had been previously qualified to testify as an expert witness in other Indian child cases. The trial court qualified her as an expert witness, and Mother did not object to this ruling.

¶ 24 Testifying as an Indian expert pursuant to 25 U.S.C. § 1912, Farris was satisfied that active efforts had been provided to prevent the termination of Mother's parental rights. Farris became involved with the children's case in late February 2009. She believed the Cherokee Nation and DHS had offered Mother "every possible service." The evidence clearly and convincingly establishes that the DHS and the Cherokee Nation engaged in active efforts to help Mother obtain services designed to preserve the family.

¶ 25 Farris monitored the reports from Mother's periodic court review hearings. In mid-October 2009, Farris became concerned about Mother's failure to make progress on any item in her ISP, because six months had passed since the plan was entered by the district court. Farris testified that she sat down with Mother and discussed the plan "point by point," emphasizing that "not so many people get so much time." During this discussion, Farris asked Mother to write a narrative about how her case had progressed and her failure to complete certain require-

ments of her ISP. Farris stated that Mother wrote a four-page narrative, complaining about how DHS was "holding her back." Mother complained that she missed scheduled appointments because she had no way to get to them and no one would help her with transportation. This led to Farris's assessment that Mother, although clearly understanding the ISP and being capable of completing it, wanted to blame others for her failure. Farris testified: "From the beginning of the case, I have told [Mother] that she can have Cherokee Nation transportation as long as she gave me a week's advance notice." She reminded Mother of this "every time she missed an appointment because she didn't have a ride." Farris's efforts involved tracking Mother down, and driving her to court dates, appointments and visitation.

¶ 26 In the narrative she provided to Farris, Mother also wrote that she was feeling depressed. But Farris noted that one of the requirements that Mother had not completed was the psychological evaluation, the purpose of which was to address Mother's depression and other mental/emotional issues. Farris advised Mother that if she did not make progress toward completing her ISP within the next couple of months, the Cherokee Nation would support termination of her parental rights should DHS recommend it. Approximately four months later, the Cherokee Nation supported and approved DHS's recommendation to seek termination of Mother's parental rights.

¶ 27 The record indicates that Mother made only token efforts to address her substance abuse issues. After Mother finally obtained the required substance abuse assessment on May 2010, she had two subsequent positive drug tests, one of which occurred during the termination trial. Mother insisted, more than once during her testimony, that she was not an addict. She stated she turned to drugs to help her cope and when she was feeling "stressed out."

¶ 28 The record demonstrates a lack of effort on Mother's part to eliminate the risks posed by her continued drug use. Farris testified that KP and KP had suffered physical and emotional abuse because of Mother's drug problem and that her failure to address

that problem "definitely" would result in harm to the children.[6] It was Farris's opinion that Mother's continued custody would result in serious emotional or physical damage to the children and it was in their best interests to terminate Mother's parental rights. We find that the State satisfied its evidentiary burden on this issue.

## IV.  Alleged Juror Misconduct

¶ 29 In her final proposition of error, Mother asserts that one of the jurors (Juror 5) was guilty of misconduct. She claims that Juror 5 discussed the case in a phone conversation with his wife, during an evening recess near the end of trial, and he expressed an opinion adverse to Mother's case. Mother claims that the district court erred by denying her request to remove Juror 5 and replace him with an alternate juror, and as a result she was denied her right to a fair and impartial jury.

¶ 30 To protect the integrity of the jury, the district court is required to instruct the jurors that they have a duty not to converse among themselves, or with others, concerning any subject of the trial.[7] Accordingly, when this matter was brought to the district court's attention, it interviewed Juror 5 in the presence of the parties' attorneys.

JUROR [5]: I was speaking with my wife, and she wanted to know why you're going to be late. I said, "They've got some more evidence. I'm hoping this winds up pretty quick." Yes.

THE COURT: Did you say something about foster mother getting the kids?

JUROR [5]: I said, "We're not there yet."

THE COURT: Did you say anything about the foster mother, "I hope"—

JUROR[5]: I said she had just testified.

THE COURT: Did you say anything about "I hope the foster mother gets the kids"?

JUROR [5]: No. I did not make that statement. I said she had just testified.

. . . .

JUROR [5]: And that she—I said it looks like she would like to get the children, but I said, "I don't know how that's going to go."

¶ 31 After the district court explored the facts behind the limited discussion between Juror 5 and his wife, it was not convinced that Juror 5 was guilty of prejudicial misconduct and declined to remove him. The court found "no evidence that he has communicated or discussed ... the facts of the case, merely telling his wife what happened when he told her he was going to be late." Nonetheless, the district court allowed the attorneys to question Juror 5, if they so desired. The court also gave the parties the opportunity to make any further motions regarding the issue. Mother made no further inquiry of Juror 5, nor questioned the court's rationale. She did not move for a mistrial.

¶ 32 A judgment will not be reversed for misconduct of jury unless such misconduct is clearly shown. *See Mullinix Constr. Co. v. Myers*, 1960 OK 241, ¶ 28, 358 P.2d 187, 192 (new trial will not be granted for misconduct of jurors unless the circumstances raise a reasonable suspicion that such misconduct improperly influenced the verdict); *City of Lawton v. McAdams*, 1905 OK 45, ¶ 0, 15 Okla. 412, 83 P. 429 (Syllabus 5) "(It is not error for the trial court to refuse to grant a new trial on the ground of misconduct of the jury, where it appears that

---

6.  "[T]he evidence must show the existence of particular conditions in the home that are likely to result in serious emotional or physical damage to the particular child who is the subject of the proceeding. The evidence must show the causal relationship between the conditions that exist and the damage that is likely to result." *See* Bureau of Indian Affairs, Guidelines for State Courts; Indian Child Custody Proceedings, D.3(c), 44 Fed. Reg. 67584, 67593 (November, 26, 1979) (BIA Guideline D.3[c]). Although the Guidelines are not binding on this Court, we find them instructive.

7.  Title 12 O.S.2001 § 581 provides: "If the jury are permitted to separate, either during the trial or after the case is submitted to them, they shall be admonished by the court that it is their duty not to converse with, or suffer themselves to be addressed by, any other person, on any subject of the trial, and that it is their duty not to form or express an opinion thereon, until the case is finally submitted to them."

no prejudice could have resulted to the unsuccessful party."). After reviewing the circumstances presented here, we conclude that the district court did not abuse its discretion in refusing to discharge Juror 5. The district court apparently found Juror 5's explanation for the phone call to his wife to be credible, and it was in a better position than this Court to determine Juror 5's credibility. In light of Juror 5's explanation, it was proper for the district court to conclude that no prejudice would result to Mother and refuse to remove Juror 5 from the panel. Mother has not seriously challenged, and indeed cannot successfully challenge, this determination.

¶ 33 Recitals of general principles regarding fair trial and jury misconduct fail to provide the specificity to demonstrate error. The record before this Court is insufficient to establish misconduct of a character that prevented a fair and impartial verdict. Absent a showing of prejudicial misconduct, we find no cause for reversal. *See Middlebrook v. Imler, Tenny & Kugler M.D.'s, Inc.,* 1985 OK 66, ¶¶ 34–35, 713 P.2d 572, 584–85. *See also Robinson v. Borg–Warner Protective Servs. Corp.,* 2001 OK 59, ¶¶ 6–11, 31 P.3d 1041, 1043–44 (district court did not commit reversible error when it declined to grant motion for new trial on the ground of juror misconduct, where court found juror credible and plaintiff's counsel declined the offer of an evidentiary hearing concerning the incident and did not move for mistrial).[8]

8. Even in criminal cases, the complaining party must demonstrate that an unauthorized contact created actual juror bias; "courts should not presume that a contact was prejudicial." *See U.S. v. Robertson,* 473 F.3d 1289, 1294 (10th Cir.2007) (quoting *U.S. v. Frost,* 125 F.3d 346, 377 (6th Cir.1997)).

## CONCLUSION

¶ 34 Based on the record before us, we find that the State met its evidentiary burden to support termination of Mother's parental rights to her minor children, KP and KP. There is clear and convincing evidence in the record that Mother failed to correct the conditions which led to the children's deprived status and failed to provide support for her children as required by court order. The record establishes by clear and convincing evidence that it is in the children's best interests that Mother's parental rights be terminated. Further, the record contains the required testimony of a qualified expert, which Mother did not challenge, from which the jury could conclude, beyond a reasonable doubt, that continued custody by Mother would result in serious emotional or physical damage to the children. Mother has not shown any juror misconduct sufficient to demonstrate prejudice or denial of a fair trial. Therefore, we affirm the district court's order terminating Mother's parental rights to KP and KP.

¶ 35 **AFFIRMED.**

BARNES, P.J., and WISEMAN, J., concur.