2014 OK CIV APP 6

**In the Matter of A.F.K.; M.J.K. and M.A.K., Deprived Children.**

**Denise Knight, Appellant,**

v.

**State of Oklahoma, Appellee.**

**Nos. 111622, 111625.**

Court of Civil Appeals of Oklahoma, Division No. 3.

Dec. 5, 2013.

Mathew Thomas, Stuart, Clover, Duran, Thomas & Vorndran, Shawnee, Oklahoma, for Appellant Mother.

Russ B. Haskins, Shawnee, Oklahoma, for Appellant Father.

Tracy L. McDaniel, Lincoln County District Attorney's Office, Chandler, Oklahoma, for Appellee.

Traci L. Soderstrom, Del City, Oklahoma, for Minor Children.

BRIAN JACK GOREE, Judge.

¶ 1 This is an appeal of an order terminating parental rights following a jury trial. The State of Oklahoma alleged the parents failed to correct the conditions which led to the finding that their children were deprived. The parents were given notice of the conditions that needed to be corrected in September of 2011 and the State's motion to terminate parental rights, based on those same conditions, was filed in December of 2012. Six verdict forms were completed by the jury, one for each parent as to each of their three children. The verdict forms contain special interrogatories, and the jury specified the precise conditions they found the parents had failed to correct. The termination order includes findings that the parents were permitted not less than three months to correct the conditions, that termination is in the best interest of the children, and that the conditions alleged in the Petition were not corrected. The order does not specifically identify the conditions that were not corrected. But neither parent seeks reversal based on an objection to the form of the termination order.[1]

¶ 2 Three issues are presented for our review: (1) whether the State presented clear and convincing evidence to support the verdicts, (2) whether the State made reasonable efforts to return the children to their home, and (3) whether an indigent parent received effective assistance of counsel. For the reasons that follow, we affirm.

¶ 3 On June 16, 2011, State filed a petition alleging M.A.K., M.J.K., and A.F.K. (Children) were deprived because of (1) exposure to domestic violence, (2) exposure to substance abuse, (3) lack of a permanent residence, and (4) being left [with] or being

---

1. In its Order, the trial court found: "The Jury found by clear and convincing evidence that the children were adjudicated as deprived on August 22, 2011, that [Parents have] failed to correct the conditions alleged in the State's Petition filed June 16, 2011, which resulted in the deprived adjudication, that [Parents have] been permitted a period of time of not less than three (3) months to correct the conditions which [led] to the finding that the children are deprived, that continued custody by the [Parents] is likely to result in serious emotional or physical damage to the children as supported by the testimony of witnesses, and it is in the best interest of the Respondent Juveniles to terminate the parental rights of [Parents] in and to the Respondent Juveniles, [A.K., M.K., and M.K.]."

exposed to inappropriate care givers. The petition identified the parents as Denise Knight (Mother) and Levi Knight (Father).

¶ 4 On August 22, 2011, the case came on for adjudication and both parents stipulated to the allegations in the petition. On September 22, 2011, Mother appeared personally and Father appeared by his counsel at a disposition hearing. The Disposition Order adopted an Individualized Service Plan (ISP) and advised Mother and Father "that failure to comply with any requirements of the treatment plan or any requirements of the Court including failing to appear at any court hearing may result in the loss of custody of the children or the termination of parental rights to the children." The September 2011 ISP was given to both parents. Below the section entitled, "Conditions or Behaviors which need to be changed or corrected" the ISP states: "Parents need to not engage in domestic violence in the home. Parents need to protect their children from dangerous people. Parents need to not abuse substances. Parents need to have a stable home." We observe that the allegations of the Petition which led to the adjudication that Children were deprived are consistent with the conditions set forth in the ISP that parents needed to correct.[2]

¶ 5 The ISP required each Parent to attend domestic violence classes, attend drug and alcohol education groups, submit to random drug testing, obtain legal and verifiable means of income, obtain adequate stable housing, follow through with medical professionals to assure M.A.K.'s medical needs are met,[3] complete a parenting course, visit Children as ordered by the trial court or by the DHS worker, contact DHS worker at least once a month or as ordered by the trial court, attend any scheduled court hearings, and pay child support as ordered by the trial court.

¶ 6 On December 5, 2012, more than one year after Children were removed from Parents' custody, State filed a Motion to Terminate Parental Rights seeking termination of both Parents' parental rights. It alleged, pursuant to 10A O.S. Supp.2009 § 1-4-904(B)(5), Parents failed to correct the conditions which led to Children being adjudicated deprived, despite having been given more than three months to correct the conditions. It also alleged it was in the best interest of Children to terminate Parents' parental rights.[4]

2. In the ISP, the reasons for the involvement of the Department of Human Services (DHS) were:

The children were removed on 06/08/11 and placed in emergency OKDHS custody. The family has substantial CW history that involves confirmed history regarding Substance Abuse by Levi and Denise, Exposure to Domestic Violence, and Abuse Kicking. The family has been offered services in these previous referrals. Also, Levi and Denise have FAILED TO COOPERATE with OKDHS on at least two occasions, January 2011 and April 2011. Levi and Denise are not providing a safe and stable home for their children often moving from home to home within a matter of months or weeks. They have, around April 2011, resided with Carolyn Stewart who is currently facing felony Child Neglect charges. They have also, in the past and currently, resided with Tanner Schepp who has significant and violent criminal history that involves Shooting With Intent to Kill. Tanner also has confirmed history that involves Domestic Violence which resulted in his current girlfriend's child being removed from his care. Levi and Denise have told CW in a past referral (RES 1372157) that Tanner has threatened to kill their children during a physical altercation that took place in front of their children. The children told the worker they see their parents punch and hit each other in the face and on the back when they argue. The children state this makes them sad. The children also stated they see Levi drink Whiskey on a daily basis and state he falls down and throws up when he drinks. Levi and Denise are allowing their children around Kelly Burns who had her own child removed by CW due to domestic violence between she and Tanner Schepp. Denise states she has allowed Tanner and Kelly to watch the children unsupervised with their children. Denise and Levi both stated they are living "here and there" and currently do not have a home.

3. A pediatric cardiologist recommended M.A.K.'s heart condition be surgically repaired.

4. Section 1-4-904 provides, in part:

A. A court shall not terminate the rights of a parent to a child unless:
1. The child has been adjudicated to be deprived either prior to or concurrently with a proceeding to terminate parental rights; and
2. Termination of parental rights is in the best interest of the child.
B. The court may terminate the rights of a parent to a child based upon the following legal grounds:

¶ 7 Each of the verdict forms provided:

We, the jury, empaneled and sworn in the above entitled cause, do upon our oaths, find that the parental rights of [Parent] should be terminated on the statutory ground that after being permitted a period of time not less than three (3) months to correct the conditions which led to the finding that the child is a deprived child, [Parent] has failed to do so. The conditions that have not been corrected which led to the finding that the child is a deprived child are:

___ Domestic Violence

___ Protect your children and refrain from exposing yourself and your children to dangerous or inappropriate individuals

___ Substance Abuse

___ Maintain a safe and stable home

All six verdict forms bear check marks next to each of the conditions.[5]

¶ 8 On February 27, 2013, the trial court entered an Order terminating Parents' parental rights to Children in accordance with the verdicts. Mother appeals (Case No. 111,622) and Father appeals (Case No. 111,625). The appeals were consolidated pursuant to Okla. Sup.Ct. R. 1.27(d) under the surviving Case No. 111,622.

¶ 9 Appellate review of parental termination decisions must be based upon the clear-and-convincing evidence standard. *Matter of S.B.C.*, 2002 OK 83, ¶ 6, ¶ 64 P.3d 1080, 1082. The factual findings must rest on clear and convincing proof. *State ex rel. A.W.*, 2011 OK CIV APP 27, ¶ 7, 250 P.3d 343, 346.

. . .

5. A finding that:
a. the parent has failed to correct the condition which led to the deprived adjudication of the child, and
b. the parent has been given at least three (3) months to correct the condition,

. . .

5. We commend the trial court for submitting separate verdict forms that permitted the jury to specify the precise conditions it found each parent did not correct with respect to each child. Separate verdict forms are appropriate when an action is tried to a jury on two or more separate

### Safe and Stable Home

¶ 10 According to the ISP, one reason the Department of Human Services intervened was that Father and Mother moved with the children from one home to another within a period of a few months or even weeks. In March of 2012, six months before the State filed its motion to terminate, Parents acquired some land near Sparks, Oklahoma and they were given the shell of a used mobile home.

¶ 11 A child welfare specialist testified for the State. She stated the home was unsafe because it did not have skirting around the base, thereby permitting children to access the area under the home which included wiring that was hanging down and could be dangerous. She also testified there was trash lying around, as though a bag of household garbage had been emptied onto the yard. There were piles of tires, mattresses, bottles, and paper. There was a depression in the yard where a child could fall two or three feet. The stairs leading to the front door were too high and there was no handrail. The wiring to the front porch light was partially exposed. The child welfare specialist stated she did not observe the inside of the home.

¶ 12 Father testified that when he was given the trailer, it was gutted. It was one big open area with no walls, poor flooring, no light switches, no wall plugs, no water heater, and no toilet. It was an empty shell. He has 15 years of experience in construction and knows how to build houses.

¶ 13 He built walls to create a living room, hallway, and bedrooms. He added a stove

causes of action. *Quarles v. Panchal*, 2011 OK 13, ¶ 5, 250 P.3d 320, 322. In this case, each verdict form constitutes a general verdict as required by 12 O.S.2011 § 587 because it is a complete pronouncement on the issue of termination, as opposed to a finding of facts alone. By including a line for a checkmark beside each of the alleged conditions, the court directed the jury to make findings as to particular questions of fact, a procedure approved by 12 O.S.2011 § 588. So long as the verdict is wholly determinative of the issue tried, special findings of fact do not deprive the verdict of its generality. *Smith v. Gizzi*, 1977 OK 91, ¶ 12, 564 P.2d 1009, 1013.

and microwave in the kitchen and installed plumbing items including a new toilet, bathtub, shower, and hot water tank. He replaced the floor with new plywood. He applied sealant to the new floors, painted the new walls, and installed some carpet. He then installed a service pole for the electricity and relied on the expertise of a licensed electrician to inspect the wiring and perform the final connections before turning on the power.

¶ 14 When Father and Mother bought the property, it included an old foundation of a home that had burned and the basement was exposed. They filled it in with multiple loads of pea gravel but a portion is still below grade, which explains the depression the child welfare worker described. Father agreed the home is not finished after eleven months of work. He also conceded it is still not safe for the children, but he is working on it. Mother argues their efforts to make the home an appropriate residence for their children constitutes evidence of a corrected condition. The record contains 16 photographs depicting the condition of the land and the mobile home. The photos are consistent with the testimony of Father as well as the DHS worker, except they do not show trash in the yard.

¶ 15 Father and Mother made significant progress in building a suitable dwelling from the time they acquired their property in March of 2012 to the date the State filed its motion to terminate their parental rights in December of 2012. The unsafe conditions identified by the State can be corrected within a short period of time when compared to the work they have already invested in their home. For example, the metal skirting would deter the children from being exposed to dangerous conditions underneath a mobile home. Father testified he has the missing skirt material on hand and it would take him one week to replace it. We believe the other deficiencies of the home identified by the state can also be corrected in a relatively short time period. We acknowledge Father's candid admission that the house is not yet safe for his children. The jury found that both parents failed to correct the condition of maintaining a safe and stable home. We

hold that the order terminating Father and Mother's parental rights, insofar as it is based upon failure to correct the condition of maintaining a safe and stable home, is not supported by clear and convincing evidence.

## Domestic Violence

¶ 16 In 2011, prior to Children being removed, Children told the DHS worker that Parents hit and punched each other in the face and on the back. There is a history of violence between the Parents which led to the requirement in the ISP that they complete domestic violence classes.

¶ 17 Mother completed a domestic violence inventory, which is a diagnostic tool to help determine if the individual has been in a violent relationship or has tendencies that could lead to domestic violence. Based on answers to the inventory questions, the evaluator will make recommendations for any counseling services that might be necessary or beneficial. The September 2011 ISP required Mother to attend domestic violence classes, but she did not submit to the domestic violence inventory until November of 2012, more than a year later and only one week before the State filed its motion to terminate her parental rights.

¶ 18 At trial, Regan Green testified on behalf of Mother. Ms. Green is an advocate for Project Safe, which is the service provider that conducted Mother's domestic violence inventory. Based on Mother's inventory responses, no domestic violence services were recommended. However, Mother nevertheless participated in an eight-week class and attended seven of the sessions. On cross-examination, Ms. Green admitted it is important that she know the history of a client's domestic violence when recommending appropriate services. She then testified that Mother had not disclosed that a protective order had been issued between Mother and Father. Neither had Mother advised her that Father had been arrested for domestic violence against Mother. Further, she was not told that Mother continued living with Father despite the fact that Father had not received domestic violence treatment. When Mother testified at trial, she admitted she had not reported her domestic violence histo-

ry on her inventory or to Ms. Green. In fact, she admitted she never disclosed to Ms. Green that she had been a victim of domestic violence.

¶ 19 Mother claims the most recent incident of domestic violence occurred in 2009, long before Children were adjudicated deprived. She claims this is not evidence of an uncorrected condition and there is no evidence of domestic violence after Children were removed from the home.

¶ 20 Father completed a domestic violence inventory in June of 2011. He was required by the September 2011 ISP to participate in domestic violence counseling. As a result of Father's 2010 conviction for domestic assault and battery (he pleaded no contest), he was sentenced to complete a 52–week domestic violence counseling program. The child welfare specialist testified that even though the law permits a motion to terminate if a parent has not corrected the conditions (that led to the deprived adjudication) within 90 days, the practice of DHS is to allow parents a full year before recommending termination. At the time of trial, Father had attended only four sessions of his 52–week domestic violence counseling program.

■ ¶ 21 Failure to comply with an ISP is not, in itself, grounds for termination of parental rights, but noncompliance with the plan may be considered as evidence that parental rights should be terminated because the parent has been unable to correct conditions leading to the child's deprived status. *Matter of L.S.*, 2013 OK CIV APP 21, ¶ 14, 298 P.3d 544, 549. The Court of Civil Appeals in *Matter of L.S.* stated:

> [The father's] inability to comply with the terms of the ISP and follow often simple directives that were repeated at each visitation was especially concerning, particularly in light of the fact that being a single father to a toddler would be much more difficult than complying with the ISP itself. Compliance with the ISP was a chance for Father to demonstrate he had met a standard of conduct expected of him in order to correct the conditions leading to the deprived adjudication and be in a position to responsibly parent L.S. *In re S.A.*, 2007 OK CIV APP 97, ¶ 12, 169 P.3d 730, 735.

The State proved by clear and convincing evidence that Father was unable to meet this level of parental competence and the jury agreed. *In re State of Oklahoma In the Interest of K.P.*, 2012 OK CIV APP 32, ¶ 22, 275 P.3d 161, 166–67 (failure to comply with the ISP service plan, in itself, is not grounds for termination of parental rights, but noncompliance with the plan may be considered as evidence that parental rights should be terminated, because the parent has been unable to correct conditions leading to the child's deprived status).

¶ 22 In the present case, Father did not complete the ISP requirements which would have demonstrated he had met a standard of conduct expected of him in order to correct the condition relating to domestic violence. Mother attended seven classes on her own terms-after delaying more than a year and then purposefully hiding material facts directly relating to her domestic abuse history. The jury could reasonably have concluded her dishonesty resulted in avoidance of necessary treatment. We hold that noncompliance with the ISP is evidence Father and Mother did not correct the condition of not engaging in domestic violence in the home. *Matter of L.S.*, 2013 OK CIV APP 21, ¶ 14, 298 P.3d at 549. The order terminating Father and Mother's parental rights based upon failure to correct the condition of domestic violence is supported by clear and convincing evidence.

### Substance Abuse

■ ¶ 23 Mother argues the State's only evidence relating to substance abuse was that she took legally prescribed medications. Father testified Mother was bipolar; however, until trial, neither the trial court nor DHS had ever been informed that Mother had this affliction. By the time of trial, Mother presented prescriptions for the drugs Xanax, an anti-anxiety drug, and Lortab, an opiate, but there was no evidence of any physician's records describing an affliction requiring those drugs. During the time Parents were working on the ISP, Mother frequently tested positive for these prescription drugs.

¶ 24 In order to correct the condition of substance abuse, the ISP required Mother to attend drug and alcohol education groups. She submitted to drug assessments that totaled five hours. She had a treatment session for fifteen minutes in October of 2011, a 45–minute individual counseling session in November, and two separate 90–minute group sessions in December. In January of 2012 she had a 30–minute session and a 60–minute session a few weeks later. She stopped attending sessions after losing her job in January of 2012 and did not complete the treatment program. Father does not contend he corrected the condition of substance abuse.

¶ 25 Because Mother did not complete her treatment program after being given more than one year to do so, and Father does not take issue with the findings of the jury, we hold the order terminating Father and Mother's parental rights based upon failure to correct the condition of substance abuse is supported by clear and convincing evidence.

### Inappropriate Care Givers

¶ 26 Regarding exposure to inappropriate care givers, Mother points out that before the Children were adjudicated deprived, Father was assaulted by his brother, Tanner Schepp, who had threatened to kill Father's family. Father obtained a protective order against him after Children were removed from the home. She claims there is no evidence Children have been exposed to inappropriate care givers since they were removed from the home.

¶ 27 Of course, because Children have been in the physical custody of a foster parent since their removal, Parents have not had an opportunity to expose them further to inappropriate care givers. However, because Parents previously had exposed Children to several inappropriate care givers with criminal records who also had their own children removed from their custody, the ISP required them to complete parenting classes, as well as the substance abuse and domestic violence classes to demonstrate a standard of conduct expected of them in order to correct the conditions leading to the deprived adjudication and be in a position to responsibly parent their Children. *See Matter of L.S.*, 2013 OK CIV APP 21, ¶ 14, 298 P.3d 544, 549.

¶ 28 In the present case, as in *Matter of L.S.*, Mother did not complete any ISP requirements which would have demonstrated she had met a standard of conduct expected of her in order to correct the condition which led to the deprived adjudication. Even though failure to comply with the ISP is not, in itself, grounds for termination of parental rights, Mother's noncompliance may be considered as evidence her parental rights should be terminated because she failed to correct conditions leading to Children's deprived status. Father does not contend he corrected this condition. We hold the order terminating Father and Mother's parental rights based upon failure to correct the condition of exposure of the children to inappropriate care givers is supported by clear and convincing evidence.

### Reasonable Efforts

¶ 29 Citing 10A O.S.2011 § 1–1–102(B)(5),[6] Father urges because of his health and financial limitations, DHS did not make reasonable efforts to assist him in correcting conditions leading to the deprived adjudication, and that it did not provide financial help to pay for ISP-required classes.

¶ 30 Father testified he had an umbilical hernia surgically repaired shortly after Children were removed from the home, the surgery failed, and he had another surgery. He scrapped metal for income, earning from $70.00 to $900.00 per month. He also complained the gasoline expense was $55.00 or $60.00 to visit Children in their foster home in Ada.[7]

---

6. The statute states it is the purpose of the laws relating to children alleged or found to be deprived to "[m]ake reasonable efforts to prevent or eliminate the need for the removal of a child from the home and make reasonable efforts to return the child to the home unless otherwise prescribed by the Oklahoma Children's Code."

7. Parents traveled to Ada from their home in Sparks in rural Lincoln County to visit Children only four times. For other visits, the foster mother drove Children to visit Parents, usually meeting them in Shawnee.

¶ 31 It is Parents' responsibility, not DHS's responsibility, to correct the conditions which led to the deprived adjudication of Children. 10A O.S.2011 § 1–4–904(B)(5)(a). Mrs. Walker, a DHS child investigation worker, worked with Parents before Children were removed from their custody. Based on referrals in January, February and April 2011 from a statewide hotline, she investigated the family's home situation. She spoke with Parents on several occasions about voluntary services which included domestic violence counseling, substance abuse counseling, housing assistance, and financial assistance. From January 2011 through June 2011 when Children were removed, Parents did not seek or receive these voluntary services. Because of Parents' failure to cooperate with her, she had to close out the earlier referrals.

¶ 32 After Children were removed from Parents' custody in June 2011, Mrs. Zumstein, the DHS worker assigned to Parents, testified that several times she referred Parents to the website and the telephone number for the Department of Rehabilitation Services which "... would have helped them with money to get to retraining. It would have helped with transportation to get to stuff like that which would have helped them." Again, Parents did not seek or receive assistance from this service. Both before and after removal of Children, by informing and encouraging Parents to avail themselves of voluntary services, DHS made reasonable efforts to prevent the need for removal of Children and to return Children to the home.

### Effective Legal Counsel

¶ 33 Mother also contends she lacked effective assistance of legal counsel. In her brief-in-chief, she stated:

Here, counsel for the Mother presented a disjointed and rambling case which con-fused and misled the finders of fact in this cause. Counsel for the Mother made innumerable and duplicative objections which lacked any legal basis, interrupted witnesses, and attempted to present extra-legal requirements into jury instructions.

¶ 34 Mother also stated that, "[e]ven if the State had presented evidence sufficient to meet the burden to establish the necessity of termination of parental rights, because the Mother lacked effective assistance of legal counsel, the matter should be reversed and remanded for proceedings in which the Mother might receive adequate representation."

¶ 35 In parental rights termination cases, because the parties have a constitutional and statutory right to be represented by an attorney, there attaches the concomitant "right to effective assistance of counsel." *Matter of D.D.F.*, 1990 OK 89, ¶ 15, 801 P.2d 703, 707.[8] In *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the United States Supreme Court held that a criminal defendant's claim that representation was so deficient so as to require reversal must show (1) that the attorney's performance was deficient and (2) the deficient performance prejudiced the defense. The Court also stated that "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. In *Matter of K.L.C.*, 2000 OK CIV APP 98, ¶ 9, 12 P.3d 478, 481, the Court of Civil Appeals took guidance from criminal cases and reasoned, "[i]n reviewing a claim of ineffective assistance of counsel, we look at the proceedings as a whole."

¶ 36 In reviewing these proceedings, Mother has not shown her counsel's performance was deficient; in fact, it appears Mother's counsel zealously represented her. Neither has Mother shown how this representation prejudiced her.[9] Looking at the proceedings as a whole, it is clear Mother did not meet

8. The Oklahoma Supreme Court has determined that threatened termination of parental rights "requires the full panoply of procedural safeguards must be applied to child deprivation hearings." This includes the right to counsel. *Matter of Chad S.*, 1978 OK 94, ¶ 12, 580 P.2d 983, 985. That case also adopted the rationale that child dependency hearings equate to criminal trials.

9. When an attorney takes no action on behalf of his client, there is a legal presumption of prejudice, an exception to the satisfaction of both prongs of the *Strickland* requirement. *Young v. State*, 1994 OK CR 84, ¶ 9, 902 P.2d 1089, 1090.

her burden of proving ineffective assistance of counsel.

¶ 37 AFFIRMED.

HETHERINGTON, P.J., adopts Judge MITCHELL'S specially concurring opinion.

MITCHELL, J., concurring specially.

¶ 38 Although I highly approve of the verdict forms used in this case, the termination order is lacking. We have held previously that the termination order based on a failure to correct conditions must identify the uncorrected conditions on which termination is based. *Matter of R.A., W.A., Z.A. and A.A.,* 2012 OK CIV APP 65, ¶ 17, 280 P.3d 366; *Matter of B.M.O.,* 1992 OK CIV APP 89, 838 P.2d 38; *Matter of E.M.,* 1999 OK CIV APP 32, 976 P.2d 1098; *Matter of B.C.,* 2010 OK CIV APP 103, 242 P.3d 589. The termination order in the instant case acknowledges the jury's findings, but fails to identify the uncorrected conditions on which termination is based. The order should identify the specific grounds for terminations and, if based on a failure to correct conditions, specifically identify those uncorrected conditions. I fully concur in all other respects.