2013 OK CIV APP 108

**In the Matter of T.S; K.S.; D.S.; K.S. and L.S., Alleged Deprived Children:**

**Brian Smith, Appellant,**

v.

**State of Oklahoma, Appellee,**

and

**Cherokee Nation, Intervenor.**

**No. 111344.**

Court of Civil Appeals of Oklahoma, Division No. 3.

Oct. 31, 2013.

As Corrected Jan. 8, 2014.

Georgia R. Manley, Grove, Oklahoma, for Appellant.

Eddie Wyant, District Attorney, Rogers S. Hughes, Assistant District Attorney, Jay, Oklahoma, for Appellee.

Christianna Lincoln Wright, Jay, Oklahoma, for Minor Children.

WM. C. HETHERINGTON, Jr., Presiding Judge.

¶ 1 Appellant Brian Smith (Father) appeals the order adjudicating T.S., K.S., D.S., K.S., and L.S., to be deprived children. Based on our interpretation of the Indian Child Welfare Act, 25 U.S.C.A. § 1901 *et seq.* (ICWA), and the Oklahoma Indian Child Welfare Act,

10 O.S.2011 § 40.1 *et seq.* (OICWA), we AFFIRM.

### FACTS AND PROCEDURAL BACKGROUND

¶ 2 The five children, whose ages ranged from 15 to 3 years, had been residing in Delaware County since 2010 with Father and his wife, Latisha Smith (Mrs. Smith), the mother of the two youngest children. On August 22, 2012, the Oklahoma Department of Human Services (OKDHS) received a referral alleging Father had physically abused K.W.S.,[1] one of his three oldest children from a prior relationship with their mother, Paula Searcy (Mrs. Searcy). On August 23, 2012, Appellee State of Oklahoma (State), on behalf of OKDHS filed an application to take the minor children into emergency custody to which was attached a supporting affidavit stating the family "is of Indian descent," detailing K.W.S.'s physical injuries, and requesting legal and physical custody of all five children based on their inability to protect themselves from such abuse.[2] That same day, a hearing was held at which Father and both mothers were present, and the juvenile court entered an order for emergency custody of all five children in OKDHS custody, indicating by checkmark that "ICWA" applied to the proceedings.[3]

 ¶ 3 At the show cause hearing held August 30, 2012, the court maintained legal custody with OKDHS and ordered physical custody of the five children with Mrs. Smith until Mrs. Searcy could get a larger home.[4]

1. Instead of using birth dates to distinguish two of the children each designated below as "K.S.," we use the middle initial of the child upon which the referral was first based.

2. Pursuant to OICWA, 10 O.S.2011 § 40.5(A), the application for an order authorizing emergency removal *shall be accompanied* by an affidavit with certain information, *i.e.,* names, addresses and tribal affiliations of the child(ren), parents or Indian custodians, circumstances leading to the removal, and "specific actions that have been taken to assist the parents or Indian custodians so that the child may safely be returned to their custody." Section 40.5 of OICWA has no corresponding ICWA provision, *except for* 25 U.S.C.A. § 1922, which allows for emergency removal of an Indian child, *"under applicable State law,* in order to prevent imminent *physical* danger or harm to such child." When a State has a higher

standard of protection than ICWA provides, the State standard "shall be applied." *See* 25 U.S.C.A. § 1921.

3. This order also indicates by checkmarks that "the *absence* of *reasonable and/or active efforts* to prevent the removal of the child(ren) from the home (or caretaker) is reasonable because the *removal is due to an alleged emergency* and is for the purpose of providing for the health, safety, or welfare of the child(ren)." (Emphasis added.)

4. The handwritten Court Minute filed August 30, 2012, in pertinent part, reads "State has met its burden as to Father. As to mothers, evid[ence] was found they failed to protect, children are not in imm[inent] danger. All children ret[urn] to L. Smith until PS has [larger] home.... Father—if bond made to have no contact w[ith] mothers or children."

The same day State filed a petition and an amended petition,[5] alleging the five children were deprived under 10A O.S.2011 § 1-1-105(20), due to alleged physical abuse by Father on the three oldest children, T.S., K.W.S., and D.S., and each mother's alleged failure to protect those children.[6] Father denied the allegations of the amended petition and requested a trial, which was set in November.

¶ 4 On September 6, 2012, the trial court transferred physical custody of the three oldest children to Mrs. Searcy. Four days later, formal notice of the deprived child proceeding involving the five children was sent to Father, both mothers, and two Indian tribes, the Cherokee Nation and United Keetoowah Bank of Cherokee Indians. By separate letters dated September 18, 2012, and filed October 1, 2012, the Cherokee Nation confirmed Father's enrollment and that each of the five children "qualified as an 'Indian child/children'" as defined by ICWA. The same tribe filed a Notice of Intervention in the deprived child proceeding on November 8, 2012.

¶ 5 During the adjudication hearing held November 14–15, 2012,[7] State called five witnesses during its case-two of Father's three oldest children, the pediatrician who had examined K.W.S. after the abuse referral,

Cherokee Nation's child welfare specialist, and OKDHS's child welfare specialist initially involved in the children's removal. State also submitted the pediatrician's forensic medical report (Exhibit No.1) and seven photographs of K.S. (Exhibits No. 2–8) for admission into evidence. The court overruled Father's objection to admitting Exhibit No. 2 and admitted it and the other exhibits into evidence. Father called one witness on his behalf. After closing arguments by State, counsel for the Children and Father regarding the evidence and ICWA's active efforts requirement for foster care placement, the trial court took a short recess and then announced on the record the reasons for his finding that the children are deprived.

### Ruling by the Juvenile Court

¶ 6 Interpreting 25 U.S.C.A. § 1912(d) *and* § 1903(1)(i), the court found "a foster care placement ... does in fact apply to this situation as, in fact, the children were removed from [Father's] household particularly." As a result, he found State was required to prove "active efforts" under § 1912(d) and that such efforts "had been made by the offering of parenting classes" to Father[8] and "in a way" by placing the children with their mothers.[9] However, the court expressly declined to find active efforts "have proven

---

5. Based on our review of these petitions, the original petition's statement that the three oldest children had "disclosed that their father, Brian Smith, has physically abused *him*" was corrected to read "has physically abused *them*." (Emphasis added.)

6. On appeal State does not mention one of the mothers is "Native American," like it did below to support its position that the purpose of keeping the Indian family together had been maintained by placement of the Indian children with that mother. A lawyer's argument is but an unsworn in-court statement of a forensic advocate which does not rise to evidence or to a stipulated fact. *Norman v. Trison Development Corp.*, 1992 OK 67, ¶ 12, 832 P.2d 6, 11. Other than State's argument, there is no testimony supporting either mother is an "Indian" as defined by § 1903(3) of ICWA, which, as relevant here, is "any person who is a member of an Indian tribe." We further note the separate letters from the Cherokee Nation designated by Father for inclusion in the record each list one mother's name with no enrollment information given, which we presume indicates neither is a member

of the Cherokee Nation. Father did not designate the letters from the United Keetoowah Bank of Cherokee Indians, which might have proven one of the mothers is in fact an "Indian." However, for purposes of this appeal, such evidence is unnecessary since ICWA's protections extend to both mothers, who undisputedly meet ICWA's definition of "parent" under § 1903(9), "any biological parent or parents of an Indian child."

7. At the commencement of the hearing, the court announced each mother had previously stipulated their respective children are deprived.

8. The form Adjudication Order indicates by checkmarks that "active efforts" had been made both to return the child to the home and to prevent the need for removal of the children.

9. The tribal juvenile expert, Ms. Watashe, confirmed the children belonged to the Cherokee Nation tribe, and although admitting the tribe didn't have anything to do with the children's placement with their mothers, she testified "that arrangement or placement is acceptable to the Cherokee Nation."

unsuccessful," concluding this part of § 1912(d) applied only to termination of parental rights.[10]

■ ¶ 7 Based on evidence and testimony supporting child abuse to four of the minor children and domestic violence in their presence, the juvenile court determined there was evidence "including testimony of the qualified expert witness, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." [11] He also found State had "met its burden" as to the "allegations of the amended petition," *i.e.*, the children are deprived because they "have not had the proper parental care or guardianship ... [and] have been abused or neglected in [Father's] care." From the court's form Adjudication Order filed November 15, 2012,[12] Father filed his timely appeal alleging the court failed to comply with ICWA's requirements under 25 U.S.C.A. § 1912(d).[13]

## ANALYSIS

### Appellate Arguments

¶ 8 Father does not challenge the juvenile court's findings that support adjudication of the Indian children as deprived under Oklahoma law *or* his finding of "serious emotional or physical damage ... if custody is continued" required for foster care placement or-

---

**10.** The juvenile court announced his conclusion of "a lack of congressional intent in seeking foster care placement that active efforts have been proven unsuccessful. I think that was meant just for termination of parental rights proceeding." Commenting "other courts have attempted to make rather constrained ways of finding active efforts have been met," the court found "there has been offering of parenting classes to Father, even the placement of these children with their mothers is certainly an attempt to prevent the breakup of the Indian family, although they are not in [Father's] care and he can't have them returned to him on his demand." After he acknowledged the opinion testimony of the qualified expert witness, Ms. Watashe, that "[active efforts] don't apply but they have been met," the court found "those things allow the Court to go forward with a finding that active efforts have been met here. I don't find that they've been proven unsuccessful, but I don't know how they could be at this stage. Again poor wording by Congress. Take that up."

**11.** We note for the record this "determination" is required by § 1912(e) of ICWA, which provides:

No foster care placement may be ordered in such proceeding in the absence of a determination, supported by clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.

The juvenile court never refers to § 1912(e) or its "clear and convincing" burden of proof. However, when announcing his decision, he quotes " § 40.5" of OICWA, which similarly provides: No *pre-adjudicatory* custody order shall remain in force and effect for more than thirty (30) days *without a determination by the court, supported by clear and convincing evidence and the testimony of at least one qualified expert witness, that custo-* *dy of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.* However, the court may, for good and sufficient cause shown, extend the effective period of such order for an additional period of sixty (60) days. (Emphasis added.) The court then found the proceeding was in compliance with the 90 day limit under § 40.5 based on the testimony of Ms. Watashe at prior status hearings that "in her opinion returning the children to [Father] would likely lead to serious emotional or physical harm." Tr. p. 220. After announcing his decisions regarding active efforts requirement, the court announced, "I do find that foster—that there has been evidence, *again, supported by an expert, qualified expert witness,* that the continued custody of the children by [Father] would likely result in serious emotional or physical harm to those children." Tr. p. 221. As we view it, the record supports substantial compliance with § 1912(e).

**12.** We note the form Adjudication Order has a checkmark in the box indicating ICWA does apply and the name of the Tribe is Cherokee. It also has a section for Active Efforts, see fn. 9. The latter section indicates "placement has been made in accordance with the placement preferences set forth in 25 U.S.C.1915." However the same form does not have a section for the critical finding required under § 1912(e) of ICWA, and the "Other" section for any additional findings, notes or recommendations is blank. For future reference, juvenile courts are advised to include the § 1912(e)'s finding for a foster care placement subject to ICWA.

**13.** In relevant part, 25 U.S.C.A. § 1914 provides, "[a]ny *Indian child* who is the subject of any action for foster care placement ... under State law, *any parent* or Indian custodian *from whose custody such child was removed* ... may petition any court of competent jurisdiction *to invalidate such action* upon a showing that such action

ders under ICWA and OICWA. *See* 25 U.S.C.A. § 1912(e); 10 O.S.2011 § 40.5. In this appeal, he agrees with the juvenile court's ruling the deprived child proceeding against him is a "foster care placement," arguing he and the minor children meet ICWA's definition of "Indian child" and "parent" and "he was not able to have his children returned upon demand, but his parental rights remained intact." However, Father disagrees with 1) States' position against a "foster care placement," 2) the opinion testimony from the Cherokee Nation Child Welfare Specialist, Ms. Watashe, that active efforts under § 1912(d) are not required prior to adjudication,[14] and 3) the court's ruling State had met its burden of clear and convincing evidence active efforts have been made to provide him remedial services and rehabilitative services to prevent the breakup of his family. He contends *"between removal of the children from his custody and the adjudication trial ... few services* were provided to the family as a whole and *almost none* were provided to [him]." (Emphasis added.)

¶ 9 State and Minor Children do not dispute ICWA's definitions of "Indian child" and "parent" include the minor children and Father or his inability to demand the return of the custody of his children in these proceedings. Instead, they argue § 1912(d)'s "active efforts" requirement for *foster care placement* "was never triggered" and "does not apply" because there is "no *placement* of the children in a foster home, institution, the home of a guardian or conservator." This argument is premised on the court's placement of the Indian children with their respective mothers *at the show cause hearing.*

¶ 10 Father takes issue with State's position, claiming it disregards the Indian parent who has been denied custody. Conceding his children were "not placed in a *traditional* foster home or guardianship for the period of time *preceding* the [adjudication] trial, he argues "foster care placement" is nevertheless involved here because the Indian children are in the *legal custody* of State in a physical placement where Father, as the Indian parent, is not able to have them returned upon demand.

*Purpose of ICWA*

¶ 11 The Congressional policy for enacting ICWA is declared in 25 U.S.C.A. § 1902:

> ... to protect the best interests of Indian children and to promote the *stability and security* of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture, and by providing for assistance as Indian tribes in the operation of child and family service programs.

---

*violated* any provision of sections 1911, *1912*, and 1913 of this title." (Emphasis added.)

**14.** During direct examination, Ms. Watashe testified: (Transcript (Tr.) p. 150–151):

Q: Based on the serious nature of the child abuse allegations, do you believe active efforts have been provided to [Father], well actually, really to the children and their families to prevent the breakup of the families?
A: Yes.
Q: And because the children are living with their mothers now, do you actually believe that they're not really placed in foster care so the active efforts standard isn't quite the same?
A: No, it isn't.
Q: Okay. Does the Tribe consider the children's home broken or in the homes with their parent?
A: They consider them being in the home with their parents.
Q: So does the active efforts standard even apply in this matter since the children are placed with parents?

A: Active efforts would have to be shown as far as [Father] *after adjudication* to reunite.
A: Not ... (interrupted)
Q: Not ... (interrupted)
A: at this point, no.
During cross-examination (Tr. p. 153), she further explained her position:
Q: If active efforts are required for [Father], I guess my question is why aren't they required now to prevent the breakup of his Indian family?
A: Well the way—the way our cases are, if adjudication occurs, then that means we need to reunite that family. If adjudication does not occur, then that family—he would be home.
Ms. Watashe's opinion on this issue *appears* to be specific to the facts of this proceeding. It is unclear whether the same opinion would apply to a deprived child proceeding involving an Indian child in which a parent's decision to stipulate or contest the adjudication of their child is delayed until he or she could meet with their court-appointed lawyer or until they can hire one.

¶ 12 This state's policy, as declared in the Oklahoma Indian Children Welfare Act, *10 O.S.2011 § 40.1 et seq.* (OICWA), is to "... ensure that the intent and provisions of the federal [ICWA] are enforced." 10 O.S.2011 § 40.1. OICWA, "in accordance with [ICWA], applies to all *child custody proceedings* involving any Indian child" except those arising from marriage dissolution proceedings or delinquency adjudications. (Emphasis added.) *See* 10 O.S.2011 § 40.3(A); 25 U.S.C.A. § 1903(1). A "child custody proceeding" is specifically defined by ICWA to include: 1) foster care placement, 2) termination of parental rights, 3) preadoptive placement, and 4) adoptive placement. *See* 25 U.S.C.A. § 1903(1)(i)-(iv).

### ICWA provisions at issue

¶ 13 According to 25 U.S.C.A. § 1912(d),

[a]ny party seeking to effect a *foster care placement* of, or termination of parental rights to, *an Indian child* under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful. (Emphasis added.)

"Foster care placement" is defined under § 1903(1)(I) of ICWA as:

any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated.

Relevant for interpretation of these provisions is ICWA's definition of "Indian child" which means "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C.A. § 1903(4). "Parent," in pertinent part, is defined by ICWA as "any biological parent or parents of an Indian child." 25 U.S.C.A. § 1903(9).

### Issues Appealed and Standard of Review

¶ 14 In order to clarify and narrow the issues presented by the parties' arguments and the juvenile court's interpretation and application of ICWA, we first address Father's argument in both briefs concerning the alleged lack of active efforts provided to him "between the *removal* of his minor children from [his] custody and the adjudication trial," which period he variously describes as "nearly three months" and "more than two months." Based on the record, his arguments would appear to include the August 23, 2012 emergency *removal* of the five Indian children during which they were undisputedly placed in a true *foster home.*

¶ 15 Considering § 1903(1)(i)'s definition of "foster care placement" includes "*any removal* of an Indian child[ren] *from a parent* or Indian custodian *for temporary placement in a foster home* or institution or the home of a guardian or conservator," the *preliminary* question not addressed by the parties or the court is—Does the children's emergency placement in a traditional foster home after they were removed under an *emergency* order from Father and Mrs. Smith satisfy the definition of "foster care placement" to which ICWA applies?

¶ 16 We answer this question in the negative, beginning with Father's recognition in his Brief in Chief that ICWA, specifically 25 U.S.C.A § 1922,[15] allows emergency removal of an Indian child from a parent or Indian custodian under limited circumstances and applicable state law, which he correctly identifies as 10A O.S.2011 § 1–4–201(A).[16] "Be-

---

**15.** For the record, § 1922 was brought to the juvenile court's attention during argument, which the transcript reveals the court reviewed prior to ruling on the merits.

**16.** Pursuant to 10A O.S.2011 § 1–1–105, "emergency custody" means the custody of a child prior to adjudication of the child following issuance of an order of the district court pursuant to

[§ ] 1–4–201 of this title or following issuance of an order of the district court pursuant to an emergency custody hearing, as specified by [§ ] 1–4–203 of this title." Similar to the requirements of § 40.5(A) of OICWA (see fn. 2), § 1–4–201(A)(1)–(2) mandates the requirements for taking emergency custody of children prior to filing a petition for adjudication, including the filing of an application which ...

cause all parties involved were aware of the tribal affiliation of both Father and his children," he admits "their emergency removal was effectuated pursuant to [§ 1922]," but argues "the temporary shelter ... provided for in § 1922 *ended* at the time the *emergency ceased*" and "*once* the children were *no longer in danger or imminent physical damage or harm* and a *juvenile proceeding was initiated* ... [he] was entitled to [§ 1912(d) ] services and programs designed to reunify his family." (Emphasis added.)

¶ 17 We consider the latter part of Father's argument as conceding State was *not* required to provide active efforts during the *emergency removal* period, *i.e.,* August 23–30, 2012. Section § 1922 together with other ICWA provisions supports both our latter position and resolves the preliminary question. The first of 1922's two sentences provides:

> Nothing in this subchapter shall be construed to prevent the *emergency removal* of an Indian child *who is a resident of or is domiciled on a reservation, but temporarily located off the reservation,* from his parent or Indian custodian *or the emergency placement of such child* in a foster home or institution, under applicable State law, *in order to prevent imminent physical damage or harm to the child.*

¶ 18 Our research reveals only six state courts which have interpreted this part of

§ 1922. Despite its express language limiting emergency removal of Indian children in imminent physical danger who are temporarily located off the reservation on which they reside or are domiciled, each court basically agrees this sentence in § 1922, when read in light of ICWA's purpose, implies permission under applicable State law for emergency removal of an Indian child in imminent physical danger who *neither* resides *nor* is domiciled on a reservation *without* the need to comply with ICWA.[17] Five of the same six courts were presented with and expressly decided § 1912(d)'s active efforts requirement does not apply to an initial detention and/or emergency removal of Indian children.

■ ¶ 19 The six state court holdings are relevant to the emergency removal in this deprived child proceeding since 25 U.S.C.A. § 1911(a)[18] provides *exclusive* jurisdiction of "any child custody proceeding involving an Indian child *who resides or is domiciled within the reservation of such tribe,*" whereas Oklahoma courts, pursuant to § 1911(b), are vested with concurrent jurisdiction with an Indian tribe "in any state proceeding for the *foster care placement* of, or termination of parental rights to, an Indian child *not domiciled or residing within the reservation of the Indian tribe's jurisdiction.*" (Emphasis added.) Importantly, § 1911(b) does not

---

*shall state facts sufficient to demonstrate to the court* that a continuation of the child in the home or with the caretaker of the child is contrary to the child's welfare and there is reasonable suspicion that:

a. the child is in need of *immediate protection* due to an *imminent safety threat,* or

b. the circumstances or surroundings of the child are such that continuation in the child's home or in the care or custody of the parent, legal guardian, or custodian would present an *imminent safety threat* to the child. (Emphasis added.)

17. The Court in *Cheyenne River Sioux Tribe v. Davis,* 822 N.W.2d 62, 64–65 (S.D.2012) refused the Indian tribe's request for a new temporary custody hearing, explaining "at least five different states have considered and rejected that ICWA fully applies at the stage of a temporary or emergency custody proceeding." *Id. See In the Matter of Esther V.,* 149 N.M. 315, 248 P.3d 863, 872–74 (2011)(ex parte and custody hearing stages are emergency proceedings to which the full requirements of ICWA do not apply); *In re*

S.B., 130 Cal.App.4th 1148, 30 Cal.Rptr.3d 726, 734–36 (2005)(held not all provisions of ICWA apply to a detention/emergency removal hearing); *Matter of the Welfare of J.A.S.,* 488 N.W.2d 332, 335 (Minn.App.1992)(testimony of a qualified Indian expert not required at the initial detention hearing since it was an emergency removal); *D.E.D. v. State,* 704 P.2d 774, 779 (Alaska 1985)(certain notice requirements under ICWA inapplicable to emergency custody proceedings or hearings); and *In the Matter of J. Charles,* 70 Or.App. 10, 688 P.2d 1354, 1358 (1984)(emergency removal of a child is initially a state law matter not subject to all ICWA requirements). Our research confirms the holdings of these cases are still persuasive law in their respective states.

18. According to 25 U.S.C.A. § 1911(a), the only exception to an Indian tribe's exclusive jurisdiction is "where such jurisdiction is otherwise vested in the State by existing federal law."

expressly vest concurrent jurisdiction to Oklahoma courts for *emergency removal* of an Indian child with the same status, which status we note describes the majority of Indian children residing in Oklahoma, including the five Indian children involved in the instant matter. We concur with the six state courts and find § 1922 authorizes the application of Oklahoma law, not ICWA, to *emergency removals* of an Indian child *not domiciled or residing within the reservation of the Indian tribe's jurisdiction* from a parent or Indian custodian in order to prevent imminent *physical* damage or harm to such child and emergency placements of such children in foster homes or institutions.

■ ¶ 20 The second sentence of § 1922 contains two mandates for State,[19] which combined further clarifies the emergency removal of the Indian children and their placement in a foster home is not part of a "child custody proceeding" to which ICWA applies. The first § 1922 mandate for "the State authority, official, or agency involved" (State) supports Father's position about *when* the emergency removal of his Indian children *ceased*—"[State] *shall insure* that the emergency removal or placement *terminates* immediately *when* such removal or placement is *no longer necessary to prevent imminent physical damage or harm to the child.*" (Emphasis added.) Applying the procedural facts of this proceeding to § 1922, State's emergency removal pursuant to § 1–4–201(A): 1) *commenced* on August 23, 2012, when the juvenile court approved State's application to remove the five Indian children from the home of Father and Mrs. Smith based on imminent *physical* harm to one of the children and awarded State *emergency* custody, and 2) *terminated* one week later, on August 30, 2012, when the juvenile court made record findings at the show cause hearing that the Indian children were no longer at risk for imminent physical harm.

■ ¶ 21 Father's position State was required to begin compliance with § 1912(d)'s active efforts *when* it filed a petition to adjudicate his Indian children as deprived is supported by § 1922's second mandate—"[State] *shall expeditiously initiate* a child custody proceeding subject to [ICWA], *transfer* the child to the jurisdiction of the appropriate Indian tribe, *or restore* the child to the parent or Indian custodian, as may be appropriate." (Emphasis added.) By use of the conjunction "or" and the final phrase "as may be appropriate" following this second mandate, ICWA clearly and unambiguously gives State only one of these three options *when* the emergency removal or placement of an Indian child has been terminated.

¶ 22 In § 1922's first option, "initiate" is a verb meaning "to begin or set going" and "perform the first actions or steps." *Webster's Third New International Dictionary Unabridged* (1986), p. 1164. Instead of the other two § 1922 options, State chose to "*initiate* a child custody proceeding subject to [ICWA]" on August 30, 2012, by 1) seeking to continue legal custody of the Indian children at the show cause hearing, which the juvenile court granted after finding State had met its burden for Father and both mothers, and, 2) promptly filing the original and amended petitions to adjudicate the Indian children as deprived and requesting they be made wards of the court.

¶ 23 Again, State and Minor Children do not dispute Father's claims he and his children meet ICWA's definitions of "Indian child" and "parent" or the children were removed from Father and Mrs. Smith *or* Father's inability to demand the return of the custody of his children in these proceedings. Although the Indian children's actual *physical* removal occurred August 23, 2012, we conclude State's actions *initiating* the deprived child proceeding against their parents and seeking to continue physical and legal custody on August 30, 2012 *is*, in light

19. The second sentence in § 1922 of ICWA provides:

The State authority, official, or agency involved shall insure that the emergency removal or placement terminates immediately when such removal or placement is no longer necessary to prevent imminent physical damage or harm to the child and shall expeditiously initiate a child custody proceeding subject to [ICWA], transfer the child to the jurisdiction of the appropriate Indian tribe, or restore the child to the parent or Indian custodian, as may be appropriate. (Emphasis added.)

of § 1922, the "removal" referenced in § 1903(1)(i)'s main clause, which broadly refers to *"any removal* of an Indian child from a parent or Indian custodian."

■ ¶ 24 Therefore, 1) whether this state proceeding is a "child custody proceeding subject to ICWA," as § 1922 requires, and 2) whether August 30, 2012 is the beginning date for all of ICWA's substantive and procedural protections, including § 1912(d)'s active efforts requirement, as Father argues, *both* depend on *if* the juvenile court's award of physical custody and placement with Mrs. Smith at the show cause hearing, falls within § 1903(1)(i)'s definition of "foster care placement." [20] This dispositive issue, for which we find no published Oklahoma opinions, is dependent on statutory interpretation of the phrase at issue, *i.e.,* "for temporary placement in a foster home or institution or the home of a guardian or conservator." Statutory construction is a question of law which we review *de novo,* without deference to the lower court. *Griffith v. Choctaw Casino of Pocola,* 2009 OK 51, ¶ 7, 230 P.3d 488, 497. If that question is answered in the affirmative, the final question—raised by Father and addressed numerous times by Oklahoma appellate courts—is whether the trial court correctly determined State met its active efforts burden under § 1912(d).

### Foster Care Placement

■ ¶ 25 State correctly argues Father's overall interpretation of the definition of "foster care placement" under § 1903(1)(I) ignores the phrase "for *temporary placement* in a *foster home or institution* or the home of a *guardian* or *conservator.*" It further argues the same definition "does not include anytime an Indian child is placed with one of his or her parents" and "there is no part of ICWA or OICWA that requires proof of active efforts when the Indian child is placed with one of his/her parents." However, State has not advanced any definitions, case

law or specific ICWA provisions to support its position this deprived proceeding does *not* involve a "foster care placement" to which § 1912(d) would apply.

■ ¶ 26 We first note the emphasized terms in the phrase at issue are not defined by ICWA or OICWA. Under basic rules of federal statutory construction, where the statute does not define its terms, they must be given their ordinary and natural meaning. *Griffith,* 2009 OK 51, ¶ 25, 230 P.3d at 497. *See also Mississippi Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 109 S.Ct. 1597, 1607–1608, 104 L.Ed.2d 29 (1989)(same rule used to interpret undefined meaning of "domicile" in ICWA). This construction rule is commonly known as the "plain meaning rule." *See* 2A, *Sutherland Statutory Construction* (5th Ed.), § 46.01.

¶ 27 The juvenile court agreed with Father's interpretation, focusing primarily on § 1903(1)(i)'s main clause, "any action removing an Indian child from its *parent* or Indian custodian." The phrase at issue, which immediately follows the main clause, is composed of two separate prepositional phrases, "for temporary placement" and "in a foster home or institution or the home of a guardian or conservator."

¶ 28 In the first phrase, the preposition "for" is "used to indicate a destination." *American Heritage Dictionary* (1986), p. 274. "Temporary" is an adverb meaning "existing or continuing for a limited time; impermanent; transitory." *Webster's Third New International Dictionary Unabridged* (1986), p. 2353. The noun, "placement," may either mean a "transfer of custody" or "an act or instance of placing," the latter verb meaning "to find a residence for." *Id.,* p. 1727–1728. In deprived child proceedings requiring removal of a child(ren) from their parent(s) to prevent further harm and transfer of their legal and physical custody to

---

20. Both State, counsel for the children, and Father treat the juvenile court as awarding physical custody to *both* mothers at the show cause hearing August 30, 2012. Although that was the ultimate result, it is clear from the court minute of the same date such award to Mrs. Searcy was *contingent* on her ability to find a larger home. Such contingency occurred quickly, and one week later, the juvenile court held another hearing at which Mrs. Searcy was awarded physical custody of her three children, leaving Mrs. Smith with physical custody of the two youngest Indian children.

State, "temporary placement" would necessarily include both of its meanings.

¶ 29 The second phrase in § 1903(1)(i) begins with "in," a preposition "used to indicate location." *Id.*, p. 1139. By use of the conjunction "or" three times within this phrase, § 1903(1)(i) identifies four optional locations. The first location, "foster home" is defined as "a household in which an orphaned, neglected or delinquent child ... is placed for care usually with the approval of the government or of a social service agency." *Id.*, p. 897.[21] Without a specific dictionary definition, the plain meaning of "foster institution" may be determined from the definitions of its separate terms, *i.e.*, "foster," which as an adjective, means "receiving, sharing or affording parental care and nurture although not related through legal or blood ties," *Id.*, p. 897, *and* "institution," which means "an establishment or foundation especially of a public charity." *Id.*, p. 1171. As used in § 1903(1)(i), "foster institution" is a privately-or publically-operated establishment providing neglected or delinquent children, in the absence of their parents, with basic needs and supervision.[22] Therefore, applying the plain meaning rule to "foster home or institution" would exclude temporary placement in the mothers' homes, since both are related by either blood or marriage to the five Indian children.

■ ¶ 30 The third location is the home of a "guardian," which is defined as "one to whom a person is committed" or "one *who has* or *is entitled or legally appointed* to the care of a minor." (Emphasis added.) *Webster's Third New International Dictionary Unabridged* (1986), p. 1007. The fourth location is the home of "conservator," meaning "a person ... designated (as by a court) to take over and protect the interests of a incompe-

tent (as a minor child)." *Id.*, p. 483. Considering the plain meanings of both terms includes court-appointment of such title, we conclude from their association with the preceding two *foster* locations that the terms "guardian" and "conservator," as used in § 1903(1)(i), also refer to a person unrelated by blood or marriage to minor children over whom a court has granted authority for their care and protection *in the absence* of their parents. Because the record does not support court appointment of either mother as a "guardian" or "conservator," we conclude the plain meaning of these terms would exclude the home of the mothers.

■ ¶ 31 State's interpretation of § 1903(1)(i)'s subject phrase is supported by the plain meaning of its terms. However, courts may reject application of the plain meaning rule *if* it creates "an ambiguity or a result that is at odds with a statute's purposes," *U.S. v. Ron Pair Enterprises., Inc.*, 489 U.S. 235, 242, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989), or would lead to "patently absurd consequences," *U.S. v. Brown*, 333 U.S. 18, 27, 68 S.Ct. 376, 381, 92 L.Ed. 442 (1948). *See also Hogg v. Oklahoma County Juvenile Bureau*, 2012 OK 107, 292 P.3d 29.

■ ¶ 32 In this case, State has never identified what other "child custody proceeding" would be involved here *if* the juvenile court's temporary placement of the Indian children with their mothers after the show cause hearing *alone* would exclude this proceeding from the definition of "foster care placement." To invoke the protections of the ICWA, the state proceeding 1) must involve an Indian child as defined by § 1903(4) of ICWA, and 2) must be a "child custody proceeding" as defined by ICWA. *Empson–Laviolette v. Crago*, 280 Mich.App. 620, 760

21. The definitions of the similar terms in the Oklahoma Children's Code are comparable. *See* 10A O.S.2011 § 1–1–105(25) ("Foster care" or "foster care services" means continuous twenty-four-hour care and supportive services provided for a child in foster placement including, but not limited to, the care, supervision, guidance, and rearing of a foster child by the foster parent); 10A O.S.2011 § 1–1–105(26) ("Foster family home" means the private residence of a foster parent who provides foster care services to a child. Such term shall include a nonkinship foster family home, a therapeutic foster family home, or the home of a relative or other kinship care home.")

22. This plain meaning is supported by 10A O.S. 2011 § 1–1–105(24), which defines "facility" as "a place, an *institution*, a building or part thereof, a set of buildings, or an area whether or not enclosing a building or set of buildings used for the lawful custody and treatment of children." (Emphasis added.)

N.W.2d 793, 797 (2008); *In re C.P.*, 181 N.C.App. 698, 641 S.E.2d 13 (2007).

¶ 33 Based on the record before us, this proceeding does not meet the definition of the remaining "child custody proceedings" to which ICWA applies, *i.e.*, termination of parental rights, preadoptive placement, or adoptive placement. Therefore, if correct, State's interpretation of § 1903(1)(i) would not only eliminate § 1912(d)'s active efforts requirement, but also ICWA's application to this state court proceeding that undisputedly involves Indian children.

■■■ ¶ 34 To determine whether *that result* is intended by ICWA under the unique facts of this proceeding, this court may not narrowly focus on words within one ICWA provision like the court and the parties did below, but must read 1903(1)(i) of ICWA "as it is written" and in light of "ICWA as a whole." *In re M.S.*, 2010 OK 46 ¶ 13–14, 237 P.3d 161, 165–166. Section § 1903(1)(i)'s definition of "foster care placement" must also be interpreted in light of ICWA's "primary goal of preventing the unwarranted removal of Indian children and the dissolution of Indian families." *Adoptive Couple v. Baby Girl*, —— U.S. ——, 133 S.Ct. 2552, 2561, 186 L.Ed.2d 729 (2013). It is "fundamental that a section of a statute should not be read in isolation from the context of the whole act … and in interpreting legislation, we must not be guided by a single sentence or member of a sentence but (should) look to the provisions of the whole law, and to its object and policy." *Matter of J.S.*, 2008 OK CIV APP 15, ¶ 11, 177 P.3d 590, 593 (quoting *Richards v. U.S.*, 369 U.S. 1, 82 S.Ct. 585, 591–592, 7 L.Ed.2d 492 (1962)).

■■■ ¶ 35 With these rules in mind, we review other ICWA provisions that similarly address "foster care placement" to determine if the plain meaning of § 1903(1)(i)'s terms is both harmonious with those provisions and consistent with ICWA's purpose and goals. Although § 1912(d) and § 1912(e) of ICWA both mandate heightened substantive protections for "foster care placements," neither statute assists in answering the specific question.

¶ 36 The same cannot be said for 25 U.S.C.A. § 1915(b),[23] which mandates the criteria and four preferences for "*foster care* or preadoptive *placement*." As relevant here, this section explains "any child accepted for *foster care* … shall be *placed* in the least restrictive setting which most approximates a *family*." (Emphasis added.) Further, the *first* of § 1915(b)'s four placement preferences is with "a member of the Indian child's *extended* family." (emphasis added). The remaining three describe foster homes or institutions which have been licensed, approved or specified by the Indian tribe or an authorized non-Indian authority ("tribe-sanctioned foster homes.")

¶ 37 Section 1915(b)'s ordered preferences clearly identify ICWA's policy that the best interest of the Indian children who have been removed from one or both of their biological parents will be served by their placement in the homes of *other* family members or in tribe-sanctioned foster homes. Despite ICWA's placement preference in homes that "most approximates a *family*," as the mothers' homes would seemingly do, the term "parent" is not included in ICWA's definition of "extended family member" under § 1903(2), which is expressly limited to the Indian child's "grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent." Therefore, placement of the

**23.** According to § 1915(b) of ICWA, a preference for foster care placement "shall be given, in the absence of good cause to the contrary, to a placement with":

(1) a member of the child's extended family;

(2) a foster home licensed, approved, or specified by the child's tribe;

(3) an Indian foster home licensed or approved by an authorized non-Indian licensing authority; or

(4) an institution for children approved by an Indian tribe or operated by an Indian organization which has a program suitable to meet the Indian child's needs.

The term "parent" is not included in the definition of "extended family member" under § 1903(2), which term *shall* be defined by the law or custom of the Indian child's tribe or, in the absence of such law or custom, *shall* be a person who has reached the age of eighteen and who is the Indian child's grandparent, aunt or uncle, brother or sister, brother-in-law or sister-in-law, niece or nephew, first or second cousin, or stepparent. (Emphasis added.)

Indian children with their respective mothers, who are undeniably immediate *family,* is neither addressed by § 1915(b) nor by § 1903(1)(i) *when* the plain meaning is applied to the phrase at issue, thereby creating a gap for the precise situation before us.

¶ 38 This apparent gap may be explained by ICWA's treatment of biological parents, whether a part of an intact family or divorced, as a single unit to protect in state court deprived or neglected child proceedings from unwarranted removal of their Indian child. In this proceeding involving a blended family and where State's petition with allegations against all three parents based on physical abuse, the intent and purpose of ICWA is to protect the children by placing them with extended family members who are not involved in the pending state court deprived proceeding. However, if this court were to accept application of the plain meaning of § 1903(1)(i)'s individual terms in the phrase at issue, the result from such strict construction would thereby exclude ICWA's heightened procedural and substantive protections for one of its intended beneficiaries in state court proceedings—a "parent" from whom the Indian children were removed and to whom those protections would otherwise apply *but for* the court's placement at the show cause hearing with another parent involved in the same deprived child proceeding.[24] We conclude ICWA, in light of its purpose and goal, did not intend such result, which essentially allows State and/or a court's placement, *even though* done with good intentions, to control whether a state court proceeding involving an Indian child is a "child custody proceeding" as defined by ICWA.

¶ 39 When allegations, like those involved here, have been brought by State, a parent's authority and/or right to make decisions for the care, custody and control of their children is transferred to the State who has an interest in protecting its children from harm. *See Skrapka v. Bonner,* 2008 OK 30, ¶ 17, 187 P.3d 202, 210; *Carignan v. State,* 1970 OK 82, ¶ 10, 469 P.2d 656, 659. That very interest was invoked here with the court-approved emergency removal of the Indian children based on physical abuse and the transfer of their legal and physical custody to State, as permitted by § 1922 of ICWA. *See In re Baby Girl L.,* 2002 OK 9, ¶ 23, 51 P.3d 544, 554.

¶ 40 Whatever legal and/or physical custodial rights Father and each mother had prior to emergency removal of the Indian children became subject to the court's supervision at that time and were transferred to State. At the show cause hearing State maintained its legal custody by meeting its preponderance of the evidence burden as to all three parents. Instead of awarding physical custody to State for placement in a traditional § 1903(1)(i) foster home, the court used its discretionary authority and awarded temporary *physical* custody to each mother, against each of whom State filed the same day its petition alleging "failure to protect."

¶ 41 Except for the family connection, there is very little difference, if any, between the court's award of physical custody to Mrs. Smith at the August 30, 2012 show cause hearing (and to Mrs. Searcy one a week later) and the typical temporary placements "in a foster home or institution or the home of guardian or conservator" under § 1903(1)(i). Such similarity weighs heavily in favor of liberal construction of this ICWA provision *when* deciding whether a state

24. Similarly, in light of § 1915(b) and the facts of this proceeding, application of the plain meaning rule would create another inconsistency/absurdity not readily detected when focusing solely on § 1903(1)(i). When all five children were removed pursuant to the emergency custody order, Mrs. Smith was residing with Father, their two children, and his three older children. Therefore, at the show cause hearing when the juvenile court initially granted Mrs. Smith temporary physical custody of the five children, she was both a "parent" of her two children and a "stepparent" of the three older children, which is one of several "extended family members" with whom § 1915(b) mandates a preference shall be given "in any foster care or preadoptive placement." Under State's strict interpretation of the subject phrase (which we presume is based on the plain meaning of its terms), the court's placement of all five children would not qualify as "foster care placement," yet as to Father's three older children, the placement with their stepparent would nevertheless comply with § 1915(b). This result demonstrates the plain meaning of § 1903(1)(i)'s terms is neither harmonious with § 1915(b) preferences nor consistent with ICWA's purpose and goals.

court proceeding involving an allegedly abused, neglected or deprived Indian child is a "foster care placement."

¶ 42 Although § 1922 does not specifically refer to "foster care placement," this provision further supports our position to liberally construe § 1903(1)(i) to include the temporary placement of the Indian children with the mothers under the specific facts of this case. It further resolves ICWA's seeming failure to address temporary placement with a "parent" as a "foster care placement" or as one of its stated placement preferences.

¶ 43 As previously discussed, we concluded State elected § 1922's first option, which choice under its express language foreclosed, *at that time*, its remaining two options, *i.e.*, "transfer the child to the jurisdiction of the appropriate Indian tribe or *restore the child to the parent* or Indian custodian." It is § 1922's third option which is critical to resolving whether ICWA intends that its protections for Father are excluded due to the placement of the Indian children with the mothers at the show cause hearing.

¶ 44 "Restore" is neither defined by ICWA nor used in any other ICWA provision. As a transitive verb in § 1922's third option, "restore" means "to bring back to a former and better state; to re-establish after interruption; to return after having been taken away." *Webster's Encyclopedic Dictionary* (1980), p. 718. In the prepositional phrase "to *the* parent or Indian custodian" which follows "restore" and its direct object, "the child," the article "the" refers to the first mention of "parent or Indian custodian" in § 1922, *i.e.*, "emergency removal of an Indian child....from his *parent or Indian custodian.*" This clear and unambiguous language identifies the "parent" from whom the child was removed as the parent to whom State must return the Indian child.

 ¶ 45 Considering § 1922 as a whole, we conclude its third option clearly and unambiguously prescribes the only circumstance to which ICWA and its protections for parents of an Indian child *would or does not apply*—when State, after declining *to initiate* a "child custody proceeding" subject to ICWA or *to transfer* the Indian child to the jurisdiction of the proper Indian tribe, choos-

es *instead* to return full legal and physical custody of an Indian child to the parent(s) from whom such child was removed. The restoration of each mother's custodial rights clearly did not occur in this proceeding. Further, the court's temporary placement of the Indian children in their homes is contrary to ICWA's purpose and may not be used here to deny ICWA's procedural and substantive protections to Father in State's deprived child proceeding against him. Therefore, for purposes of determining whether a state court proceeding involving an allegedly abused, neglected or deprived Indian child is a "foster care placement" to which ICWA applies, we conclude after termination of an emergency removal or placement pursuant to § 1922, *only* State's return of full legal and physical custody of an Indian child to a parent or parents, as defined by ICWA, makes its heightened protections unnecessary in a state custody proceeding involving such Indian child.

 ¶ 46 Our interpretation is supported by one state court which liberally construed § 1912(d) and (e) in ICWA because it "is a remedial statute in that it was enacted to stem the 'alarmingly high percentage of Indian families' being separated by removal of children through custody proceedings." *In the Matter of Esther V.*, 149 N.M. 315, 248 P.3d 863, 869 (2011). Similarly, in Oklahoma, "[i]t has long been recognized that *remedial statutes* should be construed *liberally* so as to afford all the relief within the power of the court which the language of the act indicates the Legislature intended to grant." (Emphasis added.) *Wilhoit v. State*, 2009 OK 83, ¶ 13, 226 P.3d 682, 686.

 ¶ 47 Further, the Supreme Court has also held "[i]n view of the obligation of this Nation to protect the interests of the dependent Indian people, *ambiguities* in applicable treaties, agreements, or *statutes* are construed in favor of the Indian people." (Emphasis added.) *Bittle v. Bahe*, 2008 OK 10, ¶ 16, 192 P.3d 810, 817 (citing *Choctaw Nation of Indians v. U.S.*, 318 U.S. 423, 432, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943).) As matter of law, we cannot construe § 1903(1)(i) so narrowly as to defeat ICWA's

heightened protections for Indian children, their families, and tribes and the U.S. Congress's intent for ICWA as a whole, "the main effect of which is to curtail state authority." *Matter of M.S.*, 2010 OK 46, 237 P.3d 161 (quoting *Holyfield*, 490 U.S. at 45, 109 S.Ct. at 1606). The juvenile court's finding this state court deprived child proceeding involving Indian children is a foster care placement to which ICWA applies is affirmed.

### Active Efforts

 ¶ 48 Having concluded the placement with the mothers is a "foster care placement" defined by § 1903(1)(i), we further conclude, by State's actions *initiating* such child custody proceeding subject to ICWA, it was also "*seeking to effect a foster care placement* of . . . an Indian child" under § 1912(d). The plain meaning of "seeking," as used in § 1912(d), is "to try to get or achieve" or "to make an attempt," *Webster's Third New International Dictionary Unabridged* (1986), p. 2055. We also agree with the Court's interpretation in *Matter of J. Charles*, 70 Or.App. 10, 688 P.2d 1354, 1359 (1984), that § 1912(d)'s phrase "to effect" refers to "legal proceedings required to accomplish those objectives, not the act of taking physical custody of [an Indian] child." Based thereon, the Oregon Court rejected the mother's arguments that active efforts were required before removal of a child, and found, as relevant here, "the showing required by § 1912(d) need only be made in a hearing on the *merits of foster care* placement or parental rights termination." (Emphasis added) *Id.*, at p. 1358.

¶ 49 More recently, in a contested adjudication proceeding involving an Indian child in foster care placement as involved here, the New Mexico Supreme Court in *In the Matter*

*of Esther V.*, 149 N.M. 315, 248 P.3d 863, 872–74 (2011) thoroughly compared that state's abuse and neglect statutes to ICWA to resolve *when* precisely § 1912(d) and 1912(e) must be made. The Supreme Court found that New Mexico adjudicatory hearing, *not* the ex parte and custody hearing stages, incorporates both "the procedural due process protections and stringent standard of proof" required by ICWA and "furthers the purposes and policies behind ICWA because both the parent and the tribe are able to participate meaningfully in the process." *Id.*, at 874–875.

¶ 50 The procedural protections, burdens of proof, evidentiary standards for the emergency custody and deprived child adjudication requirements required by Oklahoma Children's Code, although not identical, closely parallel New Mexico's requirements in abuse and neglect proceedings. Therefore, we join with the Court in *Matter of Esther V.*, and for the same reasons find the adjudicatory hearing is the best procedural stage in which to make the findings required by § 1912 for foster care placements.[25] Consequently, the trial court's finding State was required to prove active efforts under § 1912(d) at the adjudicatory hearing is affirmed.

### Burden of Proof in ICWA Foster Care Placement Proceedings

¶ 51 We next address Father's allegation that the court erred by finding State's active efforts requirement under § 1912(d) "had been met," because it is not supported by *clear and convincing evidence.* To support the latter burden of proof in a foster care placement, Father relies on two Oklahoma Court of Civil Appeals cases deciding State's burden of proof under § 1912(d) in a *parental rights termination* proceeding under

---

**25.** We recognize this decision is contrary to the position taken by the Bureau of Indian Affairs (BIA) in its "Guidelines for State Courts Indian Child Custody Proceedings," 44 Fed. Reg., 67,-584 (1979). In relevant part, section D. 2 of the Guidelines, "Efforts to Alleviate Need to Remove Child From Parents or Indian Custodians," provides "[a]ny party *petitioning* a state court for foster care placement or termination of parental rights to an Indian child *must demonstrate* to the court *that prior to the commencement of the pro-*

*ceeding* active efforts have been made to alleviate the need to remove the Indian child from his or her parent or Indian custodians." (Emphasis added.) However, these BIA Guidelines, which expressly state they are not binding, are generally viewed as instructive only. *See Adoptive Couple v. Baby Girl*, — U.S. —, 133 S.Ct. 2552, 2561, 186 L.Ed.2d 729 (2013); *In the Interest of K.P. and K.P.*, 2012 OK CIV APP 32, n. 6, 275 P.3d 161, 169.

ICWA is clear and convincing evidence. *See Matter of E.P.F.L.,* 2011 OK CIV APP 112, 265 P.3d 764; *Matter of J.S.,* 2008 OK CIV APP 15, 177 P.3d 590.

¶ 52 Oklahoma courts have not directly addressed the applicable burden of proof to support § 1912(d)'s active efforts in *foster care placements* subject to ICWA, but Father's assumption the same burden applies to such placement is nevertheless correct. The Supreme Court in *In re Adoption of G.D.J.,* 2011 OK 77, n. 25, 261 P.3d 1159, 1169, expressly agreed with the holding *Matter of J.S.* [26] and its authority, *Matter of the Adoption of R.L.A.,* 2006 OK CIV APP 138, ¶ 23, 147 P.3d 306, 311:

> That heightened standard of proof [beyond a reasonable doubt], *which is absent from the language of § 1912(d),* applies only to the factual determination required *by 25 U.S.C. § 1912(f)* to be made in ICWA *termination* cases, *i.e.,* "that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child," whereas the *lesser standard of "clear and convincing" evidence,* the state-law mandated burden of proof, is applicable to all other state law requirements for *termination.* (Brackets and emphasis added.) *Matter of J.S.,* 2008 OK CIV APP 15, ¶ 4, 177 P.3d 590, 591.

Relying on this quote, the Court in *Matter of E.P.F.L.* specifically determined the *burden of proof* for § 1912(d)'s active efforts requirement in a parental rights termination proceeding, *i.e.,* "[t]herefore State was only required to prove *by clear and convincing evidence* that it made *active efforts* to provide remedial services and rehabilitative programs that were designed to prevent the breakup of this Indian family." (Emphasis added.) *Id.,* 2011 OK CIV APP 112, ¶ 27, 265 P.3d 764, 770.

¶ 53 To date, no amendments have been made to § 1912(d) of ICWA, which still lacks an express burden of proof for the active efforts showing required in both foster care placement *and* termination of parental rights proceedings involving an Indian child. Unlike termination proceedings in which § 1912(f)'s "serious emotional or physical harm" determination requires the heightened burden of proof, another ICWA provision, 25 U.S.C.A. § 1912(e) applies to "foster care placement" orders. Both provisions require the identical "serious emotional or physical harm" determination, however, the burden of proof under § 1912(e) is "clear and convincing evidence." *See Matter of S.C.,* 1992 OK 98, 833 P.2d 1249, 1257 (overruled on other grounds). Therefore, in contrast to a dual burden of proof for the § 1912(d) and (f) findings in termination proceedings subject to ICWA, the same "clear and convincing" burden of proof applies to both § 1912(d) and (e) in a foster care placement subject to ICWA.

### Insufficiency of the evidence to support § 1912(d) of ICWA

¶ 54 Under § 1912(d) of ICWA, State is required to show: 1) active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, *and* 2) these "efforts have proved unsuccessful." *Matter of E.P.F.L.,* 2011 OK CIV APP 112, ¶ 30, 265 P.3d 764, 770, *In re J.S.,* 2008 OK CIV APP 15, ¶ 2, 177 P.3d 590, 592. *In the Matter of J. Charles,* 70 Or.App. 10, 688 P.2d 1354, 1359 (1984), the Court found "the language of [§ 1912(d) ] is unequivocal: The state *"shall* satisfy the court active efforts have been made to prove remedial services. To do that, the state must show that *the efforts have been made but have not worked."* (Emphasis in original.)

¶ 55 Because there is no precise definition of what constitutes "active efforts" in *parental rights termination* proceedings under § 1912(d), Oklahoma courts review such on a case-by-case basis. *In the Interest of K.P.,* 2012 OK CIVAPP 32, ¶ 17, 275 P.3d 161, 165; *Matter of E.P.F.L.,* 2011 OK CIV APP 112, ¶ 25, 265 P.3d 764, 769; *In re J.S.,* 2008 OK CIV APP 15, ¶ 7, 177 P.3d 590, 592. We find no reason why the same case-by-case review should not be applied when deciding if State has made the required active efforts in this foster care placement.

**26.** *Matter of E.P.F.L.* was decided only one week before *Adoption of G.D.J.*

¶ 56 The juvenile court's ruling State met its active efforts burden at the adjudication hearing was based on "the offering of parenting classes" to Father and "in a way" by placing the children with their mothers. In a parental rights termination proceeding, one state court has concluded "[t]here is no support in ICWA for an attempt to graft § 1915's placement preferences onto § 1912." *David S. v. State, Dept. of Health & Social Services,* 270 P.3d 767, 780 (Alaska 2012).

■■■ ¶ 57 Even if we exclude the subject placement from our review of State's active efforts in this foster care placement, the record evidence in this proceeding supports State has met its burden of clear and convincing evidence under the facts of this proceeding. Ms. Watashe, Child Welfare Specialist for the Cherokee Nation, about whom the parties stipulated she is "an expert under ICWA guidelines," testified that *since* the emergency removal of the Indian children from Father's home, she had "attended all hearings, read the reports, visited with the children, both mothers, and [Father]." She also testified she *"had requested* parenting classes because [Father] asked [her] to do that" and had "talked to him about going to career services."

¶ 58 Relying on *Matter of J.S.,* Father contends Ms Watashe's efforts concerning the parenting classes and employment "can only be described as pointing [him] in the direction of available services, rather than leading him to them." Although many of her actions would qualify as *reasonable efforts* required in non-Indian deprived child proceedings in Oklahoma, we agree with the juvenile court on her actual request for parenting classes *for* Father is "active efforts." Further, we conclude the record as a whole clearly supports there were *limited* remedial services and rehabilitative programs which State and/or Cherokee Nation could provide to Father, in light of the serious abuse allegations against him *and* his exercise of his constitutional right to deny such allegations.

¶ 59 State asked Ms. Watashe, "[b]ecause of the violent nature of [the] allegations against [Father], are there any services that can be provided to reunite him with his children at this time?" She replied, "[t]he only

thing that I'm aware of is that he could take the 52–week batterers (sic) class from the Attorney General's office through the Cherokee Nation." She also responded affirmatively to State's compound question, "Would that have to be completed before the children were reunited with them or at least started before they were reunited?"

¶ 60 State next asked Ms. Watashe, "[b]ased on the serious nature of the child abuse allegations, do you believe active efforts have been provided to [Father], well actually, really to the children and their families to prevent the breakup of this home? Ms. Watashe's answer was "yes." During cross-examination, Ms. Watashe testified her opinion of Father's "violent temper" was based on the three older children's allegations and her interview with both mothers. She also reaffirmed her testimony that she was not aware of anything to assist Father in reuniting him with his family *except* the 52–week batterer's class.

¶ 61 Father's lack of active efforts argument primarily focuses on Ms. Watashe's subsequent testimony she had not "at this time" taken any steps to help Father receive an anger management assessment by a trained professional, which she admitted was necessary to begin the 52–week batterer's program. His argument these particular remedial services and rehabilitative programs should have been provided between the temporary show cause and adjudication hearing fails to consider the emergency removal of his Indian children, their continued foster care placement with their mothers, and State's ability to provide more specific active efforts was delayed due to Father's exercise of his constitutional right to deny the allegations against him and to have his day in court. It also fails to consider the statutory 90–day limit for an adjudication hearing and the potential use against Father of any pre-adjudication participation in the anger management assessments and/or batterer's classes. Based on these reasons and the best interest of the Indian children, we affirm the juvenile court's finding State met its burden of clear and convincing proof for pre-adjudication "active efforts" in a foster care placement.

¶ 62 The clear and unambiguous language of § 1912(d) requires State to show not only that active efforts were provided but also such efforts "have been proved unsuccessful." We disagree with the juvenile court's refusal to make the finding such efforts have not worked based on his interpretation that finding is *only* required in termination proceedings under ICWA. However, we find such error harmless in light of the clear and convincing evidence supporting the adjudication of the Indian children as deprived and the court's § 1912(e) determination that Father's continued custody would likely result in "serious emotional or physical damage" to the Indian children.

¶ 63 We deny Father's request to reverse the adjudication order, to dismiss State's deprived child proceeding against his Indian children, and to return his custody, which is based solely on an alleged lack of clear and convincing evidence to support § 1912(d)'s active efforts requirement. He cites no court decisions or other authority, and we find none, which would support reversal of a deprived child adjudication order due to a lack of one or both of § 1912(d)'s active efforts requirements *when* § 1912(e) "serious emotional or physical damage" determination has *not* been challenged on appeal, and, *when* the record demonstrates that determination is supported by clear and convincing evidence, including testimony of a qualified expert witness. The Indian Child Welfare Act was not intended "as a shield to permit abusive treatment of Indian children by their parents" or to allow Indian children "to be abused, neglected, or forlorned under the guise of cultural identity." *In the Interest of M.S.*, 624 N.W.2d 678 (N.D.2001) (quoting *Matter of S.D.*, 402 N.W.2d 346, 351 (S.D.1987).

¶ 64 Our decision to affirm is supported by the U.S. Supreme Court's recent interpretation of § 1912(d) in an adoption proceeding opposed by the Indian child's biological father, a member of the Cherokee Nation who was never married to the child's mother. *See Adoptive Couple v. Baby Girl,* —— U.S. ——, 133 S.Ct. 2552, 2562–2563, 186 L.Ed.2d 729 (June 25, 2013). In pertinent part, a majority of the U.S. Supreme Court interpreted § 1912(d) to apply "only in cases where an Indian family's "breakup" would be precipitated by the termination of the parent's rights," and found such interpretation was confirmed by § 1912(d)'s "placement next to § 1912(e) and § 1912(f), both of which *condition* the outcome of proceedings on the merits of an Indian child's 'continued custody' with his parent." (Emphasis added.) *Id.* Construing these adjacent provisions together, the Court further found:

> None of the provisions create parental rights for unwed fathers where no such rights would otherwise exist. **Instead,** Indian parents who are already part of an "Indian family" *are provided with access* to "remedial services and rehabilitative programs" under § 1912(d) *so that their "custody" might be "continued" in a way that avoids foster-care placement* under § 1912(e) or termination of parental rights under § 1912(f). In other words, the provision of "remedial services and rehabilitative programs" under § 1912(d) *supports* the "continued custody" that is protected by § 1912(e) and § 1912(f). (Emphasis added; citation and footnote omitted.)

In this contested deprived child proceeding subject to ICWA, even if State had provided Father access to the specific services and programs after the show cause hearing and he had successfully commenced those programs, foster care placement could not have been avoided in light of the clear and convincing evidence supporting the juvenile court's § 1912(e)'s finding, *i.e.* at this stage of the proceeding Father's continued custody was likely to result in serious emotional or physical damage to the children.

### CONCLUSION

¶ 65 The juvenile court's order adjudicating the Indian children as deprived is **AFFIRMED.**

MITCHELL, J., concurs.

GOREE, J., concurring with opinion.

¶ 66 I concur and write separately to point out that the State's Petition sought removal of the Indian children and requested that

they be placed in the custody of the Department of Human Services. The trial court ordered that "the temporary custody of the child(ren) shall be with the Department of Human Services." I believe DHS falls within the meaning of "institution" as provided by § 1903(1)(i) and therefore the deprived proceeding qualified as one for "foster care placement."